Brown's Adm'r. v. L. & N. R. R. Co.

CASE 28—PETITION ORDINARY—FEBRUARY 19.

Brown's Admr. v. L. & N. R. R. Co.

APPEAL FROM LAUREL CIRCUIT COURT.

1. RAILROADS—EJECTION OF DRUNKEN PASSENGER.—Where one enters a railroad train in a helpless state of intoxication and has no ticket, and offers to pay no fare and is ejected therefrom by the conductor at a regular depot at 1 o'clock at night, at which three other passengers also left the train, and where there were two hotel porters, and the ejected passenger afterwards wanders on the track and is run over and killed, there is no liability upon the part of the company; the reasonable inference and supposition under the circumstances is that he will go to some hotel, or be taken care of by some of the citizens.

H. C. EVERSOLE FOR APPELLANT.

1. The appellant's intestate was ejected from the train at 1 o'clock at night when he was unable to take care of himself on account of his physical and mental condition; no directions were given him as to which way to get to a hotel, and when the conductor of the train knew that in a short time other trains would be

Brown's Adm'r. v. L. & N. R. R. Co.

passing both ways on the track; under the circumstances appellant was liable. L. & N. R. R. Co. v. Ellis, 17 Ky. Law Rep., 259; L. & N. R. R. Co. v Longan, 88 Ky, 241; Lexington R. R. Co. v. Sullivan, 81 Ky., 624.

J. A. CRAFT and J. W. ALCORN for appellee.

1. This case is wholly unlike those of the L. & N. R. R. Co. v. Ellis, 17 Ky. Law Rep., 259, and Lexington R. R. Co. v. Sullivan, 81 Ky., 624; in each of those cases the drunken passenger was ejected and left in a place of danger and without protection, while in this case the place where he was left was not a place of danger, and there were persons present, who were citizens of the town, which would naturally induce the belief upon the part of the conductor that he would be protected and cared for.

JUDGE GUFFY delivered the opinion of the court.

This action was instituted in the Laurel Circuit Court by Robert Brown, administrator of Jas. Brown, against the appellee, seeking to recover a judgment against the appellee for negligently causing the death of said decedent.

It is alleged in substance in the petition that the intestate, Jas. Brown, about the 2d of April, 1895, entered a coach composing one of defendant's passenger trains, running north on its road known as the night express, at Corbin, in Whitley county, Kentucky, on his way to the city of Cincinnati. That at the time said Brown entered said train he was intoxicated by the use of spirituous, vinous and malt liquor to such a degree that he was maudlin drunk, and totally helpless, both mentally and physically, in which condition said Brown remained until the train reached the depot of the defendant in the town of London, Laurel County, Ky., at which time and place the agents and servants of the defendant, who well knew the then drunken and helpless condition of said James Brown unlawfully with willful negli-

gence, by force ejected said James Brown, plaintiff's intestate, from and off of said car and left him in the dark at night, time about one o'clock at night, near the track of its railroad, said agents and servants knowing at the time that the trains operated on said railroad, both freight and passenger trains, would soon thereafter be passing said depot at London, where they left said Brown, and knowing that said Brown was incapable of taking care of and protecting himself from death and injury from passing trains. The plaintiff further states and charges that said Brown, within a short time after he was left near the track of defendant's road, and within a few hundred feet of where he was left by defendant's agents, and while he was yet from said intoxication, drunk and unable, mentally and physically, to take care of himself, he wandered onto the track of the defendant's railroad but a short distance from where he was left by defendant's agents and servants, and was run over by one of defendant's engines and trains running south on said road, and cut into pieces and mangled so that he then and there died. All of which was the result of the willful negligence of the agents and servants of the defendant in ejecting said James Brown from the train of the defendant, to the damage of the estate of said James Brown, and to plaintiff as the administrator of said James Brown in the sum of $10,000.

The answer of defendant reads as follows: "The defendant says it is true, as alleged in the petition, that James Brown entered one of its trains at Corbin about the 2d day of April, 1895. It says it does not know what the condition of said Brown was. It denies that at the time said James Brown entered the train at Corbin he was intoxicated by

the use of spirituous, vinous or malt liquor to such an extent
that he was maudlin drunk. It denies that he was totally
helpless, either mentally or physically, denies that said Brown
remained in such drunken or helpless condition until he
reached the depot at London, Ky.; it denies that the agents
or servants of this defendant, well knowing or knowing at all
the then drunken and helpless condition of said James
Brown unlawfully or with willful negligence by force or at
all ejected plaintiff's intestate from one of its cars; it denies
that it left him in the dark at night time; denies that it left
him near the track of its railroad. It denies that it or its
agents or servants ejected said intestate from its car; denies
that it used any force whatever; it denies that its agents or
servants well knew or knew at all that the trains of defend-
ant both freight and passenger or either would soon be pass-
ing said depot at London; it denies that its agents or serv-
ants left said Brown knowing him to be incapable of taking
care of or protecting himself from death or injury from
passing trains. It denies that said Brown was in such
drunken or helpless condition at all. It denies that within a
short time after James Brown was left near the track of de-
fendant's road, or within a few hundred feet of the place
where he was left by defendant's agents or servants or
while he was from said intoxicated condition yet drunk, or
while mentally or physically unable to take care of himself,
wandered on defendant's track a short distance from where
he was left by defendant's agents or servants, and was run
over by one of defendant's engines and trains; denies that
by any wrongful act, or acts of this defendant or its agents or
servants the intestate was run over and cut into pieces or

mangled so that he then and there died; denies that said
killing was the result of the willful negligence of the agents
or servants of this defendant in ejecting James Brown from
the train of defendant. It denies that it has been guilty of
any willful or other negligence whatever. It denies that
the estate of James Brown or the plaintiff as administrator
has been damaged in the sum of $10,000, or any sum, by
any wrong of defendants, or at all.

Plaintiff's amended petition reads as follows: "The plain-
tiff, Robert Brown, administrator of the estate of James
Brown, deceased, for amendment to his original petition,
states that the agents and servants of the defendant, who
ejected plaintiff's intestate from its trains as alleged in
plaintiff's original petition, were the agents and servants
of the defendant in charge of the train from which said James
Brown was ejected, and that said agents and servants knew
the danger to which the deceased Brown would be sub-
ject to the trains of the defendant, which they knew would
be passing the depot at London, Ky., on the track of de-
fendant's railroad the place where they, the agents and serv-
ants of the defendant in charge of said train willfully and
negligently ejected said Brown from said train, as alleged
in plaintiff's original petition.

Defendant's amended answer and answer to amended pe-
tition reads as follows: The defendant for answer to the
amended petition and for amendment to its original answer
says that it denies that its agents or servants in charge of its
train knew that James Brown, the intestate, would be sub-
jected to any danger from its trains passing the depot at
London, when he left defendant's train at that point, or

when they left said Brown at that depot.  Defendant denies
that its said agents or servants willfully or negligently
ejected said Brown from the train.  Defendant denies that
it has knowledge or information sufficient to form a belief
that when said Brown entered its train at Corbin he was on
his way to Cincinnati, Ohio.  Defendant denies that when
said Brown entered its train at Corbin he was intoxicated
to such a degree that he was maudlin drunk or that he was
totally helpless or helpless at all, either physically or ment-
ally.  Defendant denies that he was totally helpless or help-
less at all, either physically or mentally, when its train
reached its depot at London, and denies that they or any
of them ejected him at London from its train.  Defendant de-
nies that said Brown was incapable of taking care of or
protecting himself when he was left at London from its
trains, and denies that he was either mentally or physically
incapable of taking care of himself when he got on to de-
fendant's railroad track after the train on which he had
been carried passed that station.

Defendant says that it admits that plaintiff's intestate did
enter its train at Corbin as a passenger, but says that when
demanded of him by the conductor in charge of its train he
failed and refused to either exhibit a ticket for his fare or to
pay his fare, and for that reason said conductor informed
him before the arrival of the train at London that he must
get off the train when that station was reached, or else
show a ticket or pay his fare, and when the train did stop at
London he failed to show a ticket or pay his fare, but vol-
untarily and in company with other passengers, prudent citi-
zens of the town of London, left the train at that station,

and did not thereafter return to it, and defendant says that these and none other are the alleged wrongs and injuries complained of in the petition and amended petition.

The affirmative matter in the answer was controverted of record. A jury trial resulted in a verdict for the defendant upon a peremptory instruction by the court. The appellant's grounds for a new trial are as follows: 1. Because the court failed and refused to properly instruct the jury as to the law of the case. 2. Because the court erred in instructing the jury to find for the defendant in this case. 3. Because the court erred in refusing to give the instruction asked for by plaintiff, Nos. 1 and 2. 4. Because the testimony did not authorize the court to instruct the jury to find for the defendant. Appellant's motion for a new trial having been overruled, he prosecutes this appeal.

The plaintiff's testimony is as follows: "The plaintiff introduced C. M. Randall, who being sworn, testified as follows: About the last of March, 1895, or the first days of April, 1895, I got on the train of the Louisville & Nashville Railroad Company at Lilly, in Laurel county. It was the night express, running north. Mr. G. W. Delph was the conductor. There was a man lying on a seat in the smoking coach when I entered the train. He seemed to be in a stupor or asleep. The conductor and others came to him and shook him and tried to arouse him. He roused up some and said he had a ticket. The conductor looked in his pockets and his valise and found no ticket. The conductor pulled, raised him up. He didn't pay any fare or show any ticket, and said he would not pay any fare. I did not understand what he said. He muttered and cursed something. He said nothing

until he was aroused. The conductor opened his valise, and there was some clothes and a block of cannel coal in the valise. I told the conductor he might hit him with the coal. He showed no ticket nor paid any fare. The conductor told the man he would have to pay his fare or he would put him off at London. This was after he had passed Faris Station, and near London, the man was still in a stupor or drowsy. They shook him, and some of the men on the train, in the presence of the conductor, poured water on him. He had aroused some when we arrived at London. I, at the request of the conductor, carried his valise off the train. The conductor was Delph. Some one else led the man off the train. I set his valise down six or eight feet from the railroad track. The man walked to it, and when I saw him last he was stooped down over it; it had fallen open. I left him and have never seen him since, and don't know who he was. C. N. Scoville and H. C. Thompson were in company with me when I boarded the train at Lilly and when I got off at London. When I got off at London, I saw the porters of the Catching Hotel and the Riley House there standing near the train where we got off. Don't remember of seeing any one else at the depot. The man was working with his valise the last I saw of him in six or eight feet of the track of the railroad. This was about one o'clock in the morning. To leave the place, where I last saw the man, to come to Main street and come up town, he would have had to come an east course, thirty or forty yards of which distance was over a plank walk between two lots, and a fence on either side, or have gone around the depot a northeast course about two hundred feet to get to Main street, or go west

over the railroad track, and either go by the street cross-
ing or cross a culvert about twenty feet wide to get to
the west side of the railroad, or go north on the railroad
track or south on the same.    To go either north or
south there was an embankment or ditch or fence on either
side of the same, except the ways I have stated; going
north on the railroad track, there was an embankment
on either side of the railroad; to go south there was a
ditch on the right of the railroad, and a fence on the
left for several hundred feet.    The man said nothing
nor done anything until they aroused him, nor did not in-
terfere or bother the passengers. There was C. N. Scoville,
myself and H. C. Thompson got off the train, and the man
they put off.    I saw the Catching Hotel porter and Jarve
Sutton, the Riley House porter, there; that was all the peo-
ple I remember to have seen.    I think the depot was open
and lights burning in the office and waiting room.    After I
got off the train I set the man's valise down seven or eight
feet from the track, and then started off to town.    The last
I saw of him he was stooping down over his valise, and two
or three persons were standing near him.    The conductor, in
leading him off the car, simply took hold of him, and helped
him along and helped him get down off the car platform and
car steps.

The plaintiff then introduced C. N. Scoville, who testified
as follows:    That he was on the north bound train of the de-
fendant from Lilly, Ky., to London, Ky., on the night of the
last days of March or first days of April, 1895.    C. M.
Randall and H. C. Thompson were in company with me.    We
boarded the train at Lilly and got off at London, Ky.    There

was a man lying on a seat in the smoking car when we entered. He was asleep or seemed to be. Mr. Delph was the conductor. He came along and took hold of the man and shook him. He seemed to be in a stupor. The conductor finally pulled him up and looked in his pockets for a ticket. He found no ticket on him. He found some money. I saw a bill and some silver money. I don't know how much. The man was bothering no one when we went in, and did not. When the conductor pulled him up he muttered and cursed some. The conductor opened his valise; there was some clothing, shirts, socks, etc., and a block of cannel coal in the valise. The man muttered; I could not understand much he said. He said he was going to Cincinnati, Ohio. The conductor, Mr. Delph, told him if he did not produce a ticket or pay fare, he would put him off at London. To this he made no response that I heard. This was just before we reached London. When we got off, the conductor and some one else led the man off the train at the depot in London. C. M. Randall carried his valise. It was a black valise eighteen inches or two feet long. I left the depot for home; the man was standing six or eight feet from the railroad track at his valise; he hallooed a time or two just before I left. Before reaching London the conductor and others poured water on him, in his face and under his clothes. They had aroused him a little by the time we reached London. The man was quiet all the time, unless, when they were working with him; then he muttered, and about all I understood was that he was going to Cincinnati, and that he had a ticket, but the conductor and the other parties could not find any ticket after searching everything. I did not know him. Never

saw him any more.   It was about one a. m. when we got off
the train.   The regular time for the express train to pass
south at London at night was between two and three a. m.
each day at that time.   The conductor and others pulled him
up in his seat.   The man seemed to be in a stupor or drunk.
He could not speak so he could be understood, except I un-
derstood him to say he was going to Cincinnati, and that he
had a ticket.   After the conductor had aroused him up he
said he had a ticket.   The conductor examined his pockets
and valise, but found no ticket.   The porters from the
hotels in London were in the habit of meeting that train at
the depot, and I saw them there when we got off that night.
There may have been others there, but I do not remember
about that. Mr. Randall, Mr. Thompson and I were all well
acquainted with the conductor.   We had tickets for London,
which he took up.

The plaintiff then introduced H. C. Thompson, who testi-
fied that on the night of the last days of March or the first
days of April, 1895, he, with C. M. Randall and C. N. Scoville,
entered the train of the defendant at Lilly, Ky., at night.   It
was the north-bound express.   When we entered, we went
into the smoking car, and there was a man, I did not know,
lying on a seat asleep, or seemed to be.   The conductor
came along, and he and some of his men took hold of the
man, shook him and looked in his pockets for his ticket,
but found none, and looked in his valise.   They found some
money on him.    It was the conductor, Mr. Delph, who
searched him for ticket and looked in his valise.   He had
ten dollars in paper money and some coins in his pockets.   I
don't know how much.   The conductor told the man he would

put him off if he did not show his ticket or pay his fare.
The man was drunk or in a stupor for some cause. He was
bothering no one, nor said anything until the conductor and
others commenced working with him; he then muttered
and probably swore. He was very drunk or in a stupor
for some cause; appeared to be drunk. I understood him to
say he was going to Cincinnati, Ohio, and that he claimed
to have a ticket. The conductor or some one, by his di-
rections, poured water on him. When we arrived at Lon-
don the conductor and some of his men took hold of the man,
and led him off the train. C. M. Randall carried his valise,
at the request of the conductor. I went off on the west
side of the train and they led the man off on the east side
of the train. I did not see the man any more until next
morning at the the depot I saw his corpse. He had been
cut up from some cause and badly mangled, and was dead.
It was the same man that I saw taken off the train that I
saw dead next morning at the depot. I heard his name
was James Brown next morning after he was found dead.

It was about 1 a. m. when he was put off the train at
London. The man did not want to leave the train, and
seemed to be trying to resist being put off; did not agree
to go off.

The plaintiff then introduced Jarvis Sutton, who tes-
tified that on the morning of the 2d of April, 1895, at 1
a. m., or about that time, the north bound express train
on the L. & N. railroad arrived at London, Ky. I was
then a porter for the Riley House, a hotel in London, which
is one or two hundred yards from the depot. C. M. Ran-
dall and C. N. Scoville and another man got off the train.

I did not see H. C. Thompson. The man I did not know was drunk. C. M. Randall carried his valise off and set it down. Some one led the drunken man off. I did not know the man that was led off the train. He went to his valise, and some one of the train men said take him to a hotel, he had money to pay his fare. I spoke to him and asked him if he wished to go to a hotel, he said no, said he wanted to go to Pittsburg. I told him he would have to go north on the railroad track to go down to Pittsburg. He picked up his valise and started south. I told him that was the wrong direction, and he said he knew where he was going, and went off in the dark on the railroad, south from the railroad depot. I saw the same man dead on the railroad track south of the depot next morning; he had been cut on the legs and body and was dead, his legs broke and his body nearly cut into pieces. The man was drunk when put off the train, but could walk. I was porter for the Riley House and was in the habit of going to the depot to meet that train to solicit customers for our house. The porter of the Catching Hotel was there also. We had lanterns. The man stood where Mr. Randall had left his valise until the train had gone. He then walked up to the baggage truck, set his valise down and pulled off his coat. As the train was pulling out one of the men on the train called to us and told us to take the man to a hotel, that he had money to pay his bill.

The plaintiff then introduced Fred Hagy, who stated, that on the morning of April 2, 1895, he found a man dead on the track of the Louisville & Nashville Railroad Company 350 or 400 feet south of the depot at London, Ky. I did not know him; he was a heavy looking man. From what I could

see his body was nearly severed across his bust, his legs and thighs broken. His head and a portion of his body was on the outside of the railing, the other portion of his body between the railing of the road track. I found the man about daylight. I learned that his name was Brown. I did not know him. His corpse was given over to some of his relations and taken to Pittsburg, in Laurel county, three miles north of London, Ky. The track of the L. & N. railroad from the depot to where the man was killed is above the level of the ground, a ditch on the right side and an embankment; on the left is a fence and ditch. To leave the depot and go north there is an embankment on each side of the road for several hundred feet; in order to get up to Main street, there is a yard; but before you get to Main street you come to the lot of Mr. Vogliotties, about 200 feet along Main street; in order to reach Main street there is a four foot walk between his lot and Mrs. Jackson's lot, or you can go north and around the lot and reach Main street, a distance of 200 feet. The corpse was sent to Pittsburg in care of some of his friends.

The plaintiff then introduced W. L. Brown. I am judge of the Laurel County Court. On the morning of April 2, 1895, I learned there was a dead man on the track of the L. & N. railroad. I went over there and just 300 or 400 feet south of the depot I found a man dead and had an inquest. I learned from letters on him, and from his relations, that his name was James Brown. I gave his corpse over to his relation, Renos Brown, at Pittsburg, Ky., in this county. He is no relation to me. His body was nearly severed across his bust, his thighs broken and otherwise

badly mangled. He was lying across the railing of the railroad track, partly on the outside and part of his body on the inside of the track. He had been struck about fifty feet north of the place where I found his body, blood, hair and bones scattered along. His valise was also north of him some feet; had some shirts, socks and a block of cannel coal in it, and also a broken bottle with a little red liquor in it. From the signs the train had been running south, as the blood, etc. was on the rails for forty or fifty feet north and toward the depot from where I found the body. I did not know him when I found him. London is a town of a thousand or more inhabitants, with three or four hotels, one or two hundred yards from depot; a quiet town. It is the custom of the conductor on this line of road to take tickets as soon as they pass station, and if passenger has no ticket they are ejected at next station.

Plaintiff then introduced Wm. Stringer, who testified that he was acquainted with James Brown. Saw his corpse at his own house at Pittsburg, brought there by Renos Brown. He knew the corpse was that of James Brown, that he was accustomed to traveling on the L. &. N. railroad, that it is the custom of the conductor on said road to take up tickets of passengers on railroad as soon as they leave station where the passenger enters, and before they reach the next station, and if passengers enter without ticket and fail to pay their fare they are put off at next station.

The plaintiff then introduced James Brown, who testified, I am an uncle of the deceased James Brown. He left me at Log Mountain in Bell county on the evening of the 1st of

[15]

April, 1895, going to the State of Ohio. He left Log Mountain on a branch road and got to Pineville that evening, and the train leaves there at night and connects with the Jellico train at Corbin. He was a low, heavy set man, a' miner by occupation, and twenty-six years of age. I saw his corpse and know the man that was killed at London was James Brown.

The plaintiff introduced William Brown, who made the statements that James Brown made, except he said he was a brother of the deceased.

We need not consider the testimony introduced by the defendant. The only question for decision is whether there was any proof introduced to authorize a verdict in favor of plaintiff. It will be seen from the testimony that the intestate was so drunk that he was incapable of comprehending the situation, and of recognizing his obligation to the company, and in fact incapable of producing a ticket, if he had one, o f understanding the importance of paying his fare, or indeed to give any intelligible account as to his desires or intentions. It may also be conceded that owing to the peculiar location of the depot and grounds at London, that a person in his condition would be unable to determine as to the safety of any route which he might desire to take, if indeed he was capable of having a desire at all.

It must, however, be conceded that the appellee was not bound to carry a passenger who had no ticket, and who also failed or refused to pay his fare, and it is manifest that intestate did not produce a ticket; nor does it appear in evidence that he in fact had a ticket, and while it appears that he had in his possession a sufficient amount of money to pay his

fare, yet he did not tender the same. It was therefore lawful to eject him from the train, provided he was not left at a time and place where serious injury would be the probable result. The case of L. C. & L. R. R. Co. v. Sullivan, 81 Ky., 625, is unlike the case at bar. It appears from the evidence in that case that Sullivan was, upon the failure to pay his fare when drunk, put off the train on a very cold evening when the snow was eight or ten inches deep, and at a point some distance from any station. The facts and circumstances in that case rendered it highly probable, if not almost certain, that death or great personal injury would necessarily accrue to him.

The case of L. & N. R. R. Co. v. Ellis' Adm'r., 97 Ky., 332, is cited by appellant. In that case it appears that a passenger was ejected from a train and left at a distance from any depot, and in a cut or at a dangerous point on the road, and also that a passenger had offered to pay his fare.

It will be seen from the evidence in the case at bar that the intestate was put off the train at the town of London at a regular depot, and that three other passengers, who seemed to be citizens of that place or vicinity, got off at the same time or about the same time, and that two hotel porters were also at the depot. It is therefore manifest that the facts and circumstances did not tend to show that the intestate was in any danger of death or bodily injury as the result of being them and there ejected from the train. The reasonable presumption was that there would be no danger of his suffering from cold; nor could the appellee reasonably suppose that the intestate would go upon the railroad track where

it appears he did in fact go and receive the injury. The reasonable inference and supposition would be that he would go to some hotel, or be taken care of by some of the citizens, if in fact the appellee knew that he was too drunk to take care of himself.

Inasmuch as the evidence failed to show a right under the law to recover, the plaintiff was not prejudiced by the court refusing to give the instructions offered; nor by its giving the peremptory instruction; nor was he prejudiced by the introduction of testimony in behalf of the appellee before the peremptory instruction was given.

Judgment affirmed.