# Louisville & Nashville R. R. Co. v. Tuggle's Admr.

### (Decided January 8, 1913.)

## Appeal from Knox Circuit Court.

1. Pleading—Discretion of Court in Filing Pleading During Trial—Injury the Test in Such Cases.—The discretion of the trial court in filing pleadings during the trial is a broad one, and unless it has been abused, this court will not reverse upon that ground. If the defendant was not prejudiced by the ruling, the circuit court did not abuse its discretion, since injury must be the test in such cases.

2. Pleading—Filing Amended Rejoinder after Evidence Heard—When Not Ground for Continuance.—The ruling of the trial court in allowing an amended rejoinder to be filed after all the evidence had been heard, and traversing a plea of contributory negligence, was no ground for a continuance, where it did not appear that the defendant had been surprised or misled to its prejudice.

3. Carriers—Ejecting Passenger Who Has No Ticket—Refusal To Pay Fare—Life Must Not Be Imperiled.—A carrier has the right to eject a passenger who has no ticket, and refuses to pay his fare; but this right must be exercised in such a manner as not to imperil the life of the passenger, or subject him to danger or bodily harm.

4. Carriers Ejecting Passenger—Exercise of Ordinary Care—Physical Condition of Surroundings.—In exercising the right of ejection by a carrier, reasonable and ordinary care should be employed. In determining whether such care has been exercised, all the circumstances should be considered, such as the physical condition of the person ejected; the time, whether in daylight or late at night; the condition of the country, whether thickly or sparsely settled; the place of ejectment, whether near to or remote from dwellings of any character, including stations; and the character of the weather, whether pleasant or inclement.

5. Verdict—Negligently Causing Death—When Verdict. Not Excessive.—A verdict for $9,000.00 for negligently causing the death of a healthy man, 32 years of age, and earning $50.00 a month, is not excessive.

JAMES D. BLACK, J. W. ALCORN and BENJAMIN D. WARFIELD, for appellant.

B. B. GOLDEN, BROWN & NUCKOLS and J. D. TUGGLE, for appellee.

Opinion of the Court by Judge Miller—Affirming.

While in Middlesboro on Saturday, August 16, 1908, James Tuggle became intoxicated to such an extent that he was unable to know what he was doing, or to take care of himself. He had a basket and two jugs. While in this condition he was found by a friend, George Goodin, who paid for his supper and cared for him until about 10 o'clock at night. Tuggle lived near Barbourville; and, as he desired to go home, Goodin and Barker escorted him to the station in order that he might take the appellant's 10 o'clock northbound passenger train for Barbourville. Barker took care of Tuggle, while Goodin bought him a ticket from Middlesboro to Barbourville. The two men then placed Tuggle in the smoking car, where they left him with his basket and jugs after Goodin had put the ticket in Tuggle's coat pocket. Shortly after the train left Middlesboro, the conductor asked Tuggle for his ticket, which he was unable to find; and, as the train was crowded the conductor continued taking tickets, and directed the brakeman either to get Tuggle's ticket, or collect his fare. The brakeman succeeded in collecting from Tuggle his fare from Middlesboro to Pineville, the next principal town; but, when the train reached Pineville at about 10:45 o'clock, Tuggle remained in the car. Shortly after the train left Pineville, the conductor and brakeman stopped the train at about 11 o'clock at night, and ejected Tuggle for his failure to pay his fare. The appellant contends that Tuggle was put off the train at Wall's End, which is a regular station on its road, about one mile north or west of Pineville; while appellee contends that Tuggle was put off at a footway crossing, some four or five hundred yards south of Wall's End, and before the train reached that point. About two hours later Tuggle's dead body was found upon the track about sixteen steps north of the road or footpath crossing above referred to. He had been struck and killed by appellant's freight train, which passed that point an hour after he had been ejected from the passenger train. The station at Wall's End is elevated somewhat above the county road, which is some 15 or 20 feet distant from the railroad track, and runs substantially parallel with it; while the footpath crossing the track near where Tuggle's body was found, is somewhat steeper. Upon a trial of the case, Tuggle's administrator recovered a verdict and judgment for $9,000.00, and the defendant appeals.

In the first place, appellant insists that it was entitled to a peremptory instruction, or, that having been denied, to a judgment notwithstanding the verdict, because appellee failed to traverse appellant's plea of contributory negligence, as set up in its amended answer. The original petition was couched in general terms, and charged the appellant's conductor and brakeman with having carelessly and negligently ejected Tuggle from the train while he was in such a drunken and stupified condition, as to be incapable, mentally or physically, of caring for or protecting himself; that they left him alone while in that condition, at a point between Pineville and Wall's End, and that he was thereby run over and killed by the train from which he was ejected, or by another train owned and operated by the defendant, but that plaintiff did not know which of said trains caused his death. The original answer traversed the allegations of the petition, and affirmatively alleged that the conductor put Tuggle off at Wall's End, which was a regular station on defendant's line of railroad, for his failure to pay his fare, and that after so putting him off "they left him at said station, and where he was within reach of proper attention, if he needed such attention." The answer contains this further allegation: "But it alleges that after he was so left at said station, he wrongfully, carelessly and negligently left said station and went back up the track on the line of the defendant's railroad, and while he was on said track and away from said station, he was run over and killed by a following train, and that his presence upon the track was not discovered by the persons in charge of said train, and that he was therefore unavoidably run over and killed by said train."

The original reply specifically traversed the allegations of the answer just quoted. Subsequently, however, the plaintiff amended his petition, and stated that the place where Tuggle was killed, was within the corporate limits of the city of Pineville, and was at a point where there was, and for years had been, a regular passageway for persons living in the corporate limits of said city, and that by reason of said passageway, and its use by the inhabitants of Pineville, the defendant owed Tuggle a lookout duty, and that he came to his death by its failure to perform that duty. By a second amended petition plaintiff alleged that defendant's employees ejected Tuggle from its train with force and

violence upon a high fill and embankment, at the foot of which on either side of said railroad there was a high barbed wire fence, which made it a dangerous place to leave Tuggle unattended as they did. Evidently, this second amended petition was based upon plaintiff's theory that Tuggle was ejected at the footway crossing, and not at Wall's End. In its answer, defendant traversed the allegations of the amended petition, and affirmatively pleaded contributory negligence upon the part of Tuggle, in a third paragraph. The amended reply traversed the first and second allegations of this amended answer, but failed to notice the third paragraph above referred to, which contained the plea of contributory negligence. It will thus be seen that the pleadings presented two theories of the case: (1) that of the plaintiff, that Tuggle had been ejected at the footway crossing, which was higher and more dangerous than the station at Wall's End; and (2) the theory of the defendant, that Tuggle had been ejected at Wall's End, which was a regular station on the defendant's road; that he had wandered back up the track, and had been killed by a following freight train while near the footway crossing some 500 yards south of Wall's End station.

Appellant rests its contention that it was entitled to a peremptory instruction, upon the line of cases represented by Louisville Railway Co. v. Hibbitt, 139 Ky., 43, which hold that when a plea of contributory negligence is not traversed, the negligence stands confessed, and the defendant is entitled to a peremptory instruction requiring the jury to find for the defendant. In the case at bar, appellant not only raised the question by moving for a peremptory instruction at the close of the evidence, but further moved for a judgment notwithstanding the verdict, before the judgment for plaintiff was entered. This case, however, is not to be controlled by the principle announced in the Hibbitt case, for while the amended answer did interpose a formal plea of contributory negligence, which was not traversed, the case was actually tried upon the issues presented by the original petition and answer, and according to appellant's theory of the case. The subsequent pleadings were evidently filed on account of plaintiff's inability to ascertain the exact facts of the case; but, under the evidence, the case was tried solely under the original petition and answer. And, as the allegation of the answer which set forth the facts of contributory negligence upon Tuggle's part

were specifically denied, the rule announced in the Hibbitt case is not applicable here.

Furthermore, if we should take appellant's view that it was entitled to a peremptory instruction because its plea of contributory negligence, as found in the third paragraph of its amended answer, was not traversed, appellant's case is no stronger, because, after the case had been tried and submitted to the jury, and before the jury had found a verdict, appellee tendered, and the court filed, an amended rejoinder formally traversing the allegation of contributory negligence. Appellant contends, however, that this pleading came too late and should not have been filed, but that the court having permitted this amendment to be filed over appellant's objection, it should have sustained appellant's motion to discharge the jury and continue the case; and that its failure to so rule is a reversible error. The discretion of the court in filing pleadings during the trial of a case is a broad one, and unless that discretion has been abused, this court will not reverse upon that ground; and, if the appellant was not prejudiced by the ruling, the Circuit Court did not abuse its discretion, since injury must be the test in such cases. In the case at bar the parties had introduced all of their evidence, as though the issue of contributory negligence had been fully made, and when appellant made its motion to discharge the jury and continue the case, it was the court's duty to overrule said motion, unless the filing of the amended rejoinder, joining issue as to the contributory negligence, prejudiced the appellant. There is no claim of surprise or inability on appellant's part to present its case under the issue thus made; on the contrary, the issue had been tried as if the amended rejoinder had been filed before the trial began. The only ground for a continuance relied upon by appellant was, that the court had improperly allowed the amended rejoinder to be filed; but that was no ground for a continuance, unless appellant was thereby surprised or misled to its prejudice, which does not appear. If appellant's motion for a continuance had been sustained the record wholly fails to show that it could or would have made out a different defense, or that its defense would have been other than it was upon the trial. Courts do not and should not postpone trials except for cause. So, under either view of the case, appellant was not entitled to a peremptory

instruction or to a judgment notwithstanding the verdict and the lower court properly so ruled.

Secondly, it is insisted that the court erred in instructing the jury. The court took the view that the evidence sustained appellant's theory, that Tuggle had been ejected at Wall's End, and not at the footway crossing. After defining ordinary care, the court gave instructions 2 and 3, which read as follows:

2. "The court instructs the jury that if they believe from the evidence that on or about August 15, 1908, plaintiff's intestate, James Tuggle, was on one of defendant's trains running from the City of Middlesboro to Barbourville in such a state of intoxication as to render him mentally or physically incapable of caring for himself, and that the defendant's servants or agents in charge of said train knew his helpless condition and his inability to care for himself at the time he was ejected, and with such knowledge negligently ejected him from the train at a time and place and under such circumstances as to necessarily or probably endanger his life, by passing trains, and shortly thereafter plaintiff's intestate was killed by the train from which he was ejected or one following, they should find for the plaintiff such sum as will reasonably compensate his estate for the destruction, if any, of his power to earn money, if any, and in making their estimate the jury may take into consideration the age of plaintiff's intestate and probable duration of his life; the jury's finding, if any, cannot exceed in all the sum of $25,000.00, the amount claimed in the petition; unless the jury so believes they shall find for the defendant."

3. "The court says to the jury that you cannot find for the plaintiff unless you believe from the evidence that the decedent at the time he was ejected from the train was in such a state of intoxication that rendered him mentally or physically incapable of taking care of himself, and in such helpless condition that to put him off the train under the circumstances necessarily or probably exposed him to danger of death or great bodily harm from passing trains and that the defendant's agents and servants in charge of the train at the time had notice of the then helpless condition and the danger to which he would be or probably be exposed by being then and there ejected from the train, and that defendant's agents and servants with knowledge of such helpless condition

forcibly, wilfully, and negligently ejected him therefrom.''

The fourth instruction justified the appellant in ejecting Tuggle, if he failed to pay his fare or purchase a ticket; while the fifth instruction withdrew from the consideration of the jury the charge of negligence upon the part of those in charge of the freight train which struck Tuggle and caused his death. The sixth and last instruction merely authorized a majority verdict. It will be seen, therefore, that the second and third instructions above quoted, are the only instructions of which appellant is in a position to complain. It insists, however, that these two instructions are erroneous, in that they equally authorize the jury to find against the defendant whether Tuggle was ejected at Wall's End station, or at a point between Pineville and Wall's End; and that no attempt was made, in the instructions, to differentiate between the ejectment of Tuggle at Wall's End station, and his ejectment between stations. This contention is based upon the theory that appellant had a right to eject Tuggle at any one of its stations, regardless of the fact whether he was helplessly drunk, or not. Appellant's brief so states its position in as many words. We cannot agree to this view of the law.

The evidence shows that shortly before the train reached Wall's End, the conductor gave the ''stop'' signal for the next station, and that the train did stop at Wall's End, at about 11 o'clock at night. It was not a night station, and there was no one there. There were some 40 or 50 houses in the neighborhood of the station, but there was no one at the station, probably by reason of the hour of the night, and the fact that the train was not expected to stop there. The conductor and the brakeman took Tuggle, with his basket and jugs, and left him at the station some ten feet away from the track. One of the witnesses testified that as the train pulled out, Tuggle, in a drunken manner, started toward the train for the purpose of boarding it, whereupon the conductor told him not to attempt to get on the train. It is immaterial whether Tuggle wandered back to the place where he was killed, by walking on the track, or by walking upon the county road near the track. The negligence of defendant consisted in its leaving Tuggle, if it did so leave him, in a drunken and helpless condition, to the knowledge of appellant's conductor and brakeman, at a late hour of the night, in a strange place, upon a rail-

road track, and without any one to take care of him. There was abundant evidence tending to support that charge, and the instructions fairly submitted that question to the jury.

The rule fixing appellant's duty to Tuggle was laid down in Fagg's Admr. v. L. & N. R. R. Co., 111 Ky., 34, where the court, after reviewing the authorities, said:

"The question here for determination is, whether they should have ejected him at the time, place, and under the circumstances averred in the petition, considering his mental and physical condition. The liability of appellee if it exists, arises from the disregard of those in charge of the freight train for human life while in the performance of a legal right, and the disregard for human life by the appellee's superintendent and agent after they were advised of the perilous position which the decedent occupied, and their failure to use care to save him. All courts and all law writers agree that those in charge of the train have no right to throw a trespasser from it, while moving, and thus jeopardize his life. Principles of humanity forbid the exercise of the right in such a cruel manner. For the same reason, if they eject a trespasser who is not imperiling the lives of the officers in charge of the train, or the passengers, or doing something which makes it hazardous to permit him to remain upon the train (Railroad Co. v. Logan, 88 Ky., 232; 3 L. R. A., 80), they must be regardful of the time, place, and circumstances under which they perform the act of removal."

See, also, L. C. & L. R. R. Co. v. Sullivan, 81 Ky., 624, 50 Am. Rep., 186, and Bohannon's Admx. v. Southern Ry. Co., 112 Ky., 106.

In L. & N. R. R. Co. v. Ellis' Admr., 97 Ky., 337, the circuit court had given an instruction which assumed, as is claimed here, that the company had the right to eject a passenger regardless of the time, place and circumstances, and his physical and mental condition. In condemning that instruction, the court said:

"This certainly is not the law in this State. It seems to us that the ordinary principles which characterize humanity condemn such a claim. If the claim of appellee be true that the decedent was ejected in a cut, away from any station—with banks and fences on either side of the track—in such mental or physical condition as rendered him incapable of taking care of himself, the officer with a knowledge of his condition, then it was no less wrong to eject decedent under such circumstances than

it would have been to have ejected from the train a toddling child who had not mental capacity to know the danger of walking upon a railroad track, or the physical ability to avoid such danger if it had the mental capacity to discern it. Would any one contend if appellant should kill a child under such circumstances that it would not be liable to damages therefor?"

And, in Haug v. Great Northern Railway Co., 8 N. D., 23, 42 L. R. A., 669, the court said:

"When the carrier discovers that one helpless from intoxication is upon its train without right, it must, in selecting a safe place to put him off, have regard to his actual condition, physical and mental, without any reference to his responsibility for such condition. The law declares to the carrier that it shall not expose him to great peril even in exercising its undoubted right to eject him; and, in declaring whether he will be subject to peril, not only must climatic conditions, the propinquity of shelter, and other matters be taken into account, but also the actual state of his mind and bodily health and strength, if known to the agent of the carrier."

And, in Railway Company v. Vallelely, 32 Ohio St., 349, 30 Am. Rep., 601, the court said:

"It might, perhaps, as far as this case is concerned, be conceded that if a man were so intoxicated as to be without reason, sense, or intelligence, it would be unlawful, as it would be inhuman, to expel him from cars at night, where he would be just as likely as not to lie down upon the rails and go to sleep. We may concede further, that to put off a drunken man, during a bitterly cold night, in the woods, far from any house, when the probabilities were that he would freeze to death before help could reach him, would be as indefensible in law as it would be wicked and cruel in fact. And, further, to put a man off, in a dark night, upon a high railroad bridge, or upon the brink of a precipice, where the first step would be destruction, this could find no justification in law."

In A. T. & S. F. R. R. Co. v. Weber's Admr., 33 Kans., 554, 52 Am. Rep., 543, the court said:

"The duty of the railroad company, however, with respect to Weber, did not end with his removal from the train. He was unconscious, and unable to care for himself. The company could not leave him upon the platform helpless, exposed, and without care or attention. It was its duty to exercise reasonable care and diligence to make temporary provision for his protection and

comfort. As was said by the learned court who tried the case: 'Of course, the carrier is not required to keep hospitals or nurses for sick or insane passengers, but when a passenger is found by the carrier to be in such a helpless condition, it is the duty of the carrier to exercise the reasonable and necessary offices of humanity toward him until some suitable provision may be made.' "

In Brown v. C. B. I. & P. Ry. Co., 51 Ia., 236, the court formulated the rule fixing the carrier's duty, as follows:

"In exercising the right of ejection reasonable and ordinary care should be employed. In determining whether such care has been exercised all the circumstances should be considered, as the physical condition of the person ejected; the time, whether in daylight or late at night; the condition of the country, whether thickly or sparsely settled; the place of the ejectment, whether near to or remote from dwellings of any character, including stations; the character of the weather, whether pleasant or inclement, &c. The rules of law, as well as the dictates of humanity, require that the ejection shall occur at such place and be conducted in such manner as not unreasonably to expose the party to danger."

In Elliott on Railroads, Section 1637, the rule is formulated as follows:

"If he is so intoxicated, or so young or feeble as not to be able to take care of himself, or look out for his own safety, the company should exercise reasonable care to see to it that he is not expelled and abandoned in such a place, and under such circumstances. that he will be exposed to unnecessary peril."

All the cases which recognize the right of the carrier to eject a passenger who has no ticket and refuses to pay his fare, hold that this right must be exercised in such a manner as not to imperil the life of a passenger, or subject him to danger of bodily injury. L. & N. R. R. Co., v. Johnson, 108 Ala., 62, 31 L. R. A., 372; Central R. R. Co. v. Glass, 60 Ga., 441; Ham. v. D. & H. Canal Co., 155 Pa., 548, 20 L. R. A., 622; I. & G. N. R. Co. v. Gilbert, 64 Tex., 536; Hall v. S. C. R. R. Co., 28 S. C., 261; Isbel v. The New York & N. H. R. R. Co., 27 Conn., 395, 71 Am. Dec., 78; Wyman v. Northern P. Ry. Co., 34 Minn., 210; Connolly v. Crescent City R. R. Co., 41 La., 61, 3 L. R. A., 133; Indianapolis, Peru & Chicago R. R. Co. v. Pitzer, 109 Ind., 186, 58 Am., Rep. 387; Roseman v. Carolina Central Railroad Co., 112 N. C., 716, 19 L. R. A., 327, support the rule just announced.

Brown v. L. & N. R. R. Co., 103 Ky., 211, relied upon

by appellant, is not in conflict with the doctrine announced by the foregoing cases. In the Brown case the deceased was ejected at the station at London, Kentucky, at a time when several other passengers were alighting from the train, and porters from two hotels were at the depot to meet passengers. Furthermore, the depot was lighted and open, and as the train pulled away from the station, one of the trainmen called to the porter and told him to take the deceased to a hotel—that he had money to pay for his lodging. In the Brown case the court merely held, under those circumstances, that the trainmen had the right to assume that the deceased would be taken in charge by some of the persons who alighted at the depot, or by the hotel porters, and that it was not negligence therefore, on their part, to leave him at the station in company with other persons. In the case at bar, however, Tuggle was ejected and left alone under wholly different conditions. Appellant's rights were fully protected by instruction 3, which told the jury it could not find for the plaintiff unless it believed from the evidence that Tuggle, at the time he was ejected from the train, was in such a state of intoxication as rendered him mentally or physically incapable of taking care of himself, and in such a helpless condition that to put him off of the train under the circumstances necessarily or probably exposed him to danger, or death, or great bodily harm from passing train; and that the defendant's agents and servants in charge of the train, at the time, had notice of his helpless condition, and the danger to which he would, or probably would be exposed by being ejected from the train.

Finally, it is contended that the verdict is excessive. Tuggle was a vigorous young man, 32 years of age, and earned $2.00 a day at mining coal from a narrow seam, and under unfavorable conditions. His expectancy of life was nearly thirty years. Under the later decisions of this court, we are not prepared to say that the verdict is excessive.

In L. & N. R. R. Co. v. Engleman's Admr., 146 Ky., 19, we held that a verdict for $10,000.00, for the death of a young girl was not excessive; while in Board of Internal Improvement of Lincoln County v. Moore's Admr., 23 Ky., L. R., 181, 66 S. W., 417, we upheld a verdict for $13,000.00, for the death of a girl fourteen years of age. And, in C. & O. R. R. Co. v. Ward's Admr., 145 Ky. 733, a verdict for $12,500.00, for the death of a girl under sixteen years of age, whose earning capacity as a stenog-

rapher was shown to be about $25 per month, was sustained. See also, C. N. O. & T. P. Ry. Co. v. Lovell's Admr., 141 Ky., 249, and L. & A. R. R. Co. v. Cox's Admr., 137 Ky., 388. In the Cox case a verdict for $12,500.00, for the death of a brakeman, who earned $40.00 per month, and had an expectancy of 30 years, was held not excessive.

Judgment affirmed.