**Thomas F. MARSHALL, Administrator of the Estate of Sylvia Courtney, Deceased, Appellant,**

**v.**

**Dean VAN METER, d/b/a Frankfort Yellow Cab and City Taxi and James Bowman, Appellees.**

Court of Appeals of Kentucky.

March 14, 1969.

Marion Rider, Marvin B. Coles, Thomas F. Marshall, Frankfort, for appellant.

Chat Chancellor, Chancellor & Darnell, Frankfort, William Kiel, Mayer, Cooper & Kiel, Louisville, for appellees.

EDWARD P. HILL, Judge.

The trial court granted judgment for appellees notwithstanding the verdict for appellant for $7,563.95.

Appellant insists that the evidence amply sustained the jury's finding that deceased, Sylvia W. Courtney, was "intoxicated to

such an extent as to render her incapable of taking care of herself," and that the evidence of negligence on the part of James Bowman, in failing to take proper care of deceased, was sufficient to support the verdict's finding that such failure was the proximate cause of the injuries and resulting death of appellant's intestate.

This suit was filed by Thomas F. Marshall, as administrator of the estate of Sylvia W. Courtney, against Dean Van Meter, doing business under the trade name Frankfort Yellow Cab and City Taxi, and James Bowman, operator of one of Van Meter's taxis, alleging that on December 26, 1965, at about 7 p. m., pursuant to a telephone call, Bowman went to a house on Madison Street in Frankfort and "picked up" Mrs. Sylvia W. Courtney to transport her to her home eight miles east of Frankfort on U. S. Highway 460.

The home of deceased is situated on the north side of the road. It has two large rooms in the front with a door leading from each onto a front porch. There is a front window in each room. The outer edge of the front porch is 21 feet from the yard fence, and it is 8 feet from the fence to the nearest edge of the hard surface of the road. A 10-foot driveway enters on the west side of the house. The east side of this driveway is 21 feet from the west side of the house.

Approximately 70 feet east of a point opposite the center of the driveway, there is a berm, or shoulder, 9 feet wide at the center and tapering off at each end. It was on this right-side shoulder of the road that Bowman stopped for the purpose of letting Mrs. Courtney out of his taxi. While Bowman was sitting in his parked taxi headed east with its headlights burning, Mrs. Mildred T. Dearborn, traveling westwardly in her automobile, in which her daughter, Daune Dearborn, was riding, struck deceased, Mrs. Courtney, who was standing in or about the center of Mrs. Dearborn's right-hand lane of the highway, producing injuries from which Mrs. Courtney presently died.

The Dearborns testified they did not see deceased until the moment before the tragic act and that the lights from the taxi obscured their vision or blinded them.

We must now look to the evidence to determine (1) whether Mrs. Courtney was intoxicated to the extent Bowman owed her a higher duty to "put her out" at a safe place than would have been his duty had she been sober, (2) whether Bowman knew that she was in a high state of intoxication, and (3) assuming her intoxication, and his knowledge thereof, whether Bowman violated his duty in not transporting her to a safe place.

Bearing on the question of Mrs. Courtney's intoxication and Bowman's knowledge thereof, Bowman admitted that Roy Deakins "led her out" of the house; that she took a drink on the way home and offered him one; and that on arrival at her home he got out of the taxi, opened the door to the front seat, where, he said, Mrs. Courtney was riding and led her across the road and "through the gate." He contends he was not assisting her "through the gate" because she was intoxicated, but because her ankle was "hurting." Yet the state trooper, who shortly appeared on the scene and talked with Bowman, testified Bowman said she "appeared to be very drunk" and that she "had to have someone help her in the cab." Bowman indicated he may have had another reason for escorting Mrs. Courtney through the gate when he said: "Well, she already told me he [her husband] would be out to pay me, so I went back to the cab and was ready to take off." He did not wait for his fare at "the gate" but "went back to the cab and was ready to take off" when he heard the noise from the impact. Under a normal course of events, to a taxi driver collection of the fare is the most important part of the transaction. His evidence relative to why he took deceased across the road is somewhat discredited by the fact

that $18 was found in the purse of Mrs. Courtney after she was struck.

We have deviated somewhat from the intoxication phase of this case due to the dual reason Bowman assigned for escorting deceased through her gate. Returning to the question of intoxication, there is evidence that a deputy coroner removed a blood sample from the body of deceased that was found by the chemist of the Kentucky State Police to contain 0.27 per cent alcohol. Dr. Ollie M. Patrick, a vascular surgeon, was asked the following question:

"Q. 17 * * * [W]hat is your opinion as to the effect upon a woman fifty-seven years of age that has a point twenty-seven per cent (0.27%) by weight of alcohol in the blood, what effect would that have upon her ordinary conduct and action?

"A. Point twenty-seven would certainly affect her balance, her equilibrium. I think would affect her coordination and her speech, depress her mental thinking and nerves, and near a stuporous state."

When it is considered that Bowman was an interested witness, we think there was ample evidence from which the jury could conclude that Mrs. Courtney was in a high state of intoxication and that Bowman had knowledge of that condition.

■ Then what were his duties to Mrs. Courtney?

These duties are announced in 13 C.J.S. Carriers § 694, at page 1292 as follows:

" * * * [W]here a carrier receives as a passenger a person who is known to its employees to be partially or entirely helpless on account of intoxication, it is bound to exercise such care and assistance as his condition reasonably requires for his safety and to bestow on him such special care and attention beyond that given to an ordinary passenger as are reasonably required, even though the passenger's intoxication is in violation of a statute."

See also Louisville & N. R. Co. v. Tuggle's Adm'r, 151 Ky. 409, 152 S.W. 270, and Louisville & N. R. Co. v. Mudd's Adm'x, 173 Ky. 330, 191 S.W. 102.

Let us now consider the evidence on the question. Bowman said:

"Well I got out of my cab, went around the front of the cab, got her out of the front door of the cab, then led her around back across the road through the gate. * * * Well she already told me he would be out to pay me, so I went on back to the cab and was ready to take off. * * * I got back to the cab, I just heard a noise and when I looked back I seen Mrs. Courtney over on the road. * * * Well after I heard the noise I looked back over there and seen Mrs. Courtney, so I went on back over there where she was."

The foregoing testimony of Bowman is thoroughly contradicted by the following witnesses in one or another particular: First, by the state policeman on the question of intoxication; then, by Mr. Harold Nance (traveling east close behind the Dearborn car that struck Mrs. Courtney), who said he saw Mrs. Courtney "flying through the air." Mr. Nance said the cab pulled out immediately, turned around and parked behind his car. Mr. Nance contradicted Bowman further when he said:

"He [meaning Bowman] got out and was talking to my wife and I. He said. 'I don't understand what happened. *The lady got out of the cab, went across the road, went through the gate*, and all of a sudden she turned around and started out the gate and started back across the road and this was when the car hit her. And I don't understand why she was coming back across the road.'" (Emphasis ours.)

Mrs. Nance gave testimony substantially the same as that of Mr. Nance.

Wanda Ward, a granddaughter of Mrs. Courtney, was working a "jigsaw" puzzle in the east room of the house when the

cab pulled up and stopped. She testified she went to the front window, saw Mrs. Courtney, not in the front seat as stated by Bowman,) but in the back seat; that the dome lights of the taxi were on, and she saw Mrs. Courtney "handing" something to Bowman; that she saw Mrs. Courtney open the rear door of the cab and get out; that the driver was in the front seat when she got out; that she turned and· walked back to work on the puzzle. And before she could sit down, she heard the noise from the impact that killed Mrs. Courtney and that she ran to the door and did not see the taxi. She also stated Bowman did not bring Mrs. Courtney to the gate and that Mr. Courtney was not on the front porch before the accident. Bowman said he came out onto the porch in his underwear. Wanda also stated that Mrs. Courtney did not talk to Mr. Courtney.

Mr. Courtney said he was in the front, west room of the house when the taxi came up; that he went to the window, saw the cab, and then sat back down; that he did not go on the porch; and that he had no conversation with Mrs. Courtney or with Bowman; and that no one asked him to pay the fare.

From the foregoing, it is readily apparent that five witnesses, three of whom were apparently disinterested, have contradicted Bowman's version of the facts to such an extent it is easy to understand how the jury disbelieved it; more especially so, in view of the fact that he was an interested party.

We conclude there was amply evidence to support the verdict, and that the trial court erred in granting judgment notwithstanding the verdict.

The judgment is reversed with directions to set it aside and reinstate the judgment entered on the verdict of the jury.

MONTGOMERY, C. J., and MILLIKEN, PALMORE, STEINFELD and REED, JJ., concur.