The appeal in this case was taken from a judgment rendered in favor of the appellee in the Circuit Court for Prince George's County under an instruction of the Court by which the case was withdrawn from the consideration of the jury and a verdict directed for the defendant. *Page 605 
The suit was brought in the name of the State for the use of Eleanor Sanford Scott, the widow of Oscar Scott, and his infant son, Kenith Walter Scott, to recover damages for the death of the husband and father who was alleged to have been killed by the negligence of the defendant. The record contains two exceptions taken by the plaintiff during the course of the trial. The first relating to a ruling on evidence, and the second to the granting of the prayer submitted at the close of the plaintiff's case withdrawing the case from the consideration of the jury. The declaration contained two counts; but there was no evidence to support the second count, and it is conceded that no recovery could have been had under that count.
The defendant is a common carrier of passengers for hire and owns and operates an electric railway between the City of Washington, in the District of Columbia, and Baltimore City, in the State of Maryland.
Oscar Scott, the deceased, boarded the defendant's car as a passenger at White House Station, 15th and H streets, Washington, for Dodge Station on the defendant's line on July 1, 1915, about 7:20 P.M., and was killed at Springman's Crossing, Maryland, by a car of the defendant, running from Baltimore to Washington. The alleged breach of duty on the part of the defendant, upon which the suit is based, is specifically set out in the first count of the declaration. After stating that the deceased was a passenger upon the defendant's cars and that it was its duty to exercise the highest degree of care towards his safety, it alleged that "said defendant railroad company became and was negligent, in that on the day aforesaid, after said plaintiff's intestate who had been drinking intoxicating liquor, had purchased a ticket entitling him to safe transportation from this city to a place or station in the State of Maryland called Dodge Park, and to fit, proper and adequate protection while he, said plaintiff's intestate, was being conveyed to his said destination, and after said plaintiff's intestate had been placed upon one *Page 606 
of the defendant company's cars by said defendant company, by and through its servants, agents and employees, and had taken his seat therein, and after said car had been started from Washington for the destination of said plaintiff's intestate at said Dodge Park Station, in the State of Maryland, as aforesaid, but long before it had reached there, said defendant company, in violation of the duty owed said plaintiff's intestate, as aforesaid, who was behaving himself in a seemly and proper manner, by and through its conductor, servant or servants or agents then and there in charge of said car, maliciously, wilfully and wantonly assaulted, beat, kicked and grievously wounded and injured said plaintiff's intestate, without cause therefor on his part, and violently ejected and threw said plaintiff's intestate from its said car, whereby and by reason of which said treatment in the then condition of said plaintiff's intestate, he was so dazed, disabled and injured as that after being thus ejected from said defendant company's car, he was in a helpless condition and wandered aimlessly about said defendant company's tracks and right-of-way in his effort to find and go to his home at said Dodge Park, in the State of Maryland, as aforesaid, until later he was struck and killed by another of said defendant company's cars which was south-bound and on its way from Baltimore to the City of Washington and District of Columbia."
Assuming as contended by the plaintiff that the expulsion of the deceased from the defendant's car in the District of Columbia was unlawful and that he was assaulted and maltreated by the defendant's agents in charge of the car, the important legal question presented by the appeal is this: Does the record contain any evidence legally sufficient to show or tending to show any legal connection between the negligence alleged and the death of Scott? Stated in another way, did the plaintiff offer any evidence legally sufficient to show that there existed the relation of cause and effect between the negligence alleged and the death of Oscar Scott? The determination of this question depends upon an accurate statement of the material facts appearing in the record. In the *Page 607 
last analysis questions of proximate and remote cause must depend on the facts of each particular case. 7 Am. Eng. Ency. of Law
(2nd Ed.), 1381.
Oscar Scott was 32 years of age. He was a carpenter, and was familiar with the defendant's road, having been employed by the company as an inspector of ties. He lived near Dodge Station, Prince George's County. Shortly before his death he was working at his trade and was making four dollars per day. On the morning of July 1, 1915, he left home and went to Washington. Mrs. Scott, his widow, testified that he did not go to Washington that morning to work as he was sick; that he had been home two weeks. The record contains nothing as to Scott's whereabouts from the time he left home until he boarded the car on his return trip at about 7:20 P.M. He took a seat in the smoking compartment. He was sick and vomited in the car. A witness said he was "sick at the stomach." There were four occupants of the smoking compartment, viz., Scott, a colored man, and two white men. After Scott vomited, the two white men went into the passenger compartment. W.C. Robinnett, the motorman, testified, that he saw Scott on the car; that as the car came along Bennings race track the conductor came out front and said to him: "That he had a passenger back there that wouldn't pay his fare, and that he had been drinking and wouldn't pay his fare, and he said, `stop up there. I want to put him off;' that was along at Bennings; it was along about Bennings Race Track. So when we got to Minnesota avenue I stopped the car and waited a minute, sitting in my cab, and I heard a commotion out in the baggage room. The baggage compartment was on the front, the smoker next to that and the passenger compartment behind that. I heard the commotion out there and I sat still in my cab. I heard the conductor arguing with him, trying to get him to pay his fare, and he would not pay his fare. He said he was not going to pay the conductor his fare. Then I stepped back in the baggage part where he was." When the car reached Minnesota avenue the conductor attempted to put Scott off. He *Page 608 
resisted. He was put off twice and jumped back and held to the hand bars. The car would move slowly and stop. The witness, White, testified: "He got off the car a couple of times — they got him off the car and he would jump back on; he was right on the other side of Minnesota avenue when witness saw the conductor kicking; about a block and a half or two blocks from Minnesota avenue. The car had stopped the last time they put him off; the car was running slow; it would stop like and they couldn't get him off, and it would run a little further; he was hanging on to the grips — standing on the steps; didn't see whether or not he was dragged; heard the conductor tell Mr. Scott to get off, that is all witness heard. Didn't hear Mr. Scott make any reply. Didn't hear the motorman say anything. The motorman took part in putting Mr. Scott off; the last witness saw of Scott he was going back down the track toward Minnesota avenue; Scott's apparent condition during the time he was being put off was that of a sick man; he was vomiting when he first got on the car; that is what made me go out of the smoker; the conductor's manner exercised towards Scott throughout the ejectment was `an ugly manner.'" Bernard F. Howard testified he was in the passenger compartment and heard a commotion in the smoking car. "That between the smoking and passenger compartments there were no other compartment on the car; when the attention of witness was first attracted by the commotion did not investigate at first to see what it was about, but later on he did and found that after the car left Minnesota avenue — they stopped at Minnesota avenue and I understood they were putting a man off — but witness was reading and did not pay much attention to it until after they started up and witness heard some woman in the back say `that man will get killed.' The car witness was in, had a motorman and a conductor and after witness went in the smoking car to see what the commotion was about — didn't notice how many people were in the smoking car at the time; only went to the door; thinks there were very few but couldn't tell how many — first thought that the *Page 609 
conductor and Scott were guying or fooling with each other, and witness went back and sat down, but after the car started at Minnesota avenue, and heard this woman back there say `that man will get killed' went forward through the smoking car and found Scott standing on the bottom step with his hands on the brakeholds, and saw the conductor trying to get Scott to get off, and after Scott wouldn't get off he started kicking his hands; can not tell with what force these kicks were drove with but he was kicking with his left foot, and seemed to be worked up trying to get the man off, and he kept kicking him on the hands trying to make him loosen his hold on the handholds; they had run — they were running very slow — about a square and a half witness guesses, as far as he could judge from the inside of the car and `Scott was holding on and refused to get off. He was telling the conductor that he had his ticket and he knew he had his ticket and the conductor told him to get off. He said he wanted his hat, and the conductor told him to get off and go after his hat. The hat was lying between the tracks. The motorman asked Scott to get off. Scott said: `What in the H____ have you got to do with it? What do you want to get into it for?' The motorman said, `I don't want to get into this, but if I do get into it and then you will have to get off.' Then I turned around and went back into the passenger part of the car and sat down with my wife. Witness told the conductor once that he oughtn't to put that man off between the tracks, but he didn't pay any attention, and Scott was finally put off about a square and a half the other side of the far stop at Minnesota avenue, as near as witness could judge of it; he was put off the forward end of the car, on the inside, between the tracks. Didn't see him at the particular time that his hold was severed from the car, but when witness started to sit down with his wife he heard somebody say that the man was off and that the man had fell underneath the car. That witness looked underneath the car and saw Scott getting up, like from the side of the car, and staggering along towards the edge of the track." *Page 610 
It thus appears that Scott was finally ejected from the car in open daylight, in the District of Columbia, not far from Minnesota avenue and that he was by no means in a physically helpless condition as he displayed considerable strength and determination in resisting expulsion from the car. He was no doubt excited and disturbed by this encounter with the conductor, but there is no evidence in the record, or offer of evidence that he was mentally unsound or had ever suffered from any mental disorder. The condition of the deceased's health on the day of his death and for two weeks prior thereto was testified to by Mrs. Scott and there was no contradiction of her evidence, and therefore there was no reversible error in the ruling embraced in the first exception wherein the Court refused to permit Miss Scott to testify as "to the condition of the plaintiff's health just prior to July 1, 1915."
From Minnesota avenue, near which Scott was finally expelled from the car, to Springman's Crossing, where he was killed, the distance is variously estimated from one and a half to two and a half miles. He appears to have walked this distance over or along the defendant's right of way in less than an hour, as he was seen by one of the witnesses in the Casualty Hospital, Washington, at 8:30, where he died. The facts do not support the allegation of the narr., that after the deceased was ejected from the car "he was in a helpless condition and wandered aimlessly about said defendant's company's tracks and right of way in his effort to find and go to his home at Dodge Park." That conclusion could be reached only upon the merest conjecture.
The law does not indulge in metaphysical speculation and refinements upon the question of causation. In B. P.R.R. Co. v. Reaney, 42 Md. 117, JUDGE ALVEY said: "In the application of the maxim, in jure non remota causa sed proxima spectatur,
there is always more or less difficulty, and attempts are frequently made to introduce refinements that would not consist with principles of rational justice. The law is a practical science, and courts do not indulge refinements *Page 611 
and subtleties, as to causation, that would defeat the claims of natural justice. They rather adopt the practical rule, that the efficient and predominating cause, in producing a given event or effect, though there may be subordinate and dependent causes in operation, must be looked to in determining the rights and liabilities of the parties concerned.
It is certainly true, that where two or more independent causes concur in producing an effect, and it can not be determined which was the efficient and controlling cause, or whether, without the concurrence of both, the event would have happened at all, and a particular party is responsible for only the consequence of one of such causes, in such a case, a recovery can not be had, because it can not be judicially determined that the damage would have been done without such concurrence. Marble v. Worcester,
4 Gray, 395. But it is equally true, that no wrongdoer ought to be allowed to apportion or qualify his own wrong; and that, as a loss has actually happened whilst his own wrongful act was in force and operation, he ought not to be permitted to set up as a defense, that there was a more immediate cause of the loss, if that cause was put into operation by his own wrongful act. To entitle such party to exemption, he must show not only that the same loss might have happened, but that it must have happened if the act complained of had not been done. Davis v. Garrett, 6 Bing. 716." In City Passenger Rwy. Co. v. Kemp, 61 Md. 74, the same distinguished Judge said, in discussing the question of proximate cause: "It is not simply because the relation of cause and effect may be somewhat involved in obscurity, and therefore difficult to trace, that the principle obtains, that only the natural and proximate results of a wrongful act are to be regarded. It is only where there may be a more direct and immediate sufficient cause of the effect complained of, that the more remote cause will not be charged with the effect. If a given result can be directly traced to a particular cause, as the natural and proximate effect, why should not such effect be regarded by the law, *Page 612 
even though such cause may not always, and under all condition of things, produce like results." * * * The general rule is stated in Addison on Torts, 5, with as much clearness and precision as will be found in any other text writer, and he states the rule to be `that whoever does an illegal act is answerable for all the consequences that ensue in the ordinary and natural course of events, though those consequences be immediately and directly brought about by the intervening agency of others, provided the intervening agents were set in motion by the primary wrongdoer, or provided their acts causing the damage were the necessary or legal and natural consequence of the original wrongful act." A clear exposition of the doctrine is found in Milwaukee St.Paul Rwy. Co. v. Kellogg, 94 U.S. 469, in which JUDGE STRONG said in discussing a case in which a saw-mill and a quantity of lumber were destroyed by fire alleged to have been negligently communicated from the defendant's steamboat: "The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. The primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end, that force being the proximate cause of the movement, or as in the oft cited case of the squib thrown in the market place. Scott v. Shepherd
(Squib Case), 2 W. Bl. 892. The question always is: Was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the *Page 613 
natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances. These circumstances, in a case like the present, are the strength and direction of the wind, the combustible character of the elevator, its great height and the proximity and combustible nature of the saw-mill and the piles of lumber. Most of these circumstances were ignored in the request for instruction to the jury. Yet it is obvious that the immediate and inseparable consequences of negligently firing the elevator would have been very different if the wind had been less, if the elevator had been a low building constructed of stone, if the season had been wet, or if the lumber and the mill had been less combustible. And the defendants might well have anticipated or regarded the probable consequences of their negligence as much more far reaching than would have been natural or probable in other circumstances. We do not say that even the natural and probable consequences of a wrongful act or omission are in all cases to be chargeable to the misfeasance or nonfeasance. They are not when there is a sufficient and independent cause operating between the wrong and the injury. In such a case the resort of the sufferer must be to the originator of the intermediate cause. But when there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect, and proximate to it. The inquiry must, therefore, always be whether there was any intermediate cause disconnected from the primary fault, and self operating, which produced the injury. Here lies the difficulty. But the injury must be answered in accordance with common understanding.
"In a succession of dependent events an interval may always be seen by an acute mind between a cause and its effect, though it may be so imperceptible as to be overlooked by a common mind. Thus, if a building be set on fire by negligence, and an adjoining building be destroyed without any negligence of the occupants of the first, no one would doubt *Page 614 
that the destruction of the second was due to the negligence that caused the burning of the first. Yet in truth, in a very legitimate sense, the immediate cause of the burning of the second was the burning of the first. The same might be said of the burning of the furniture in the first. Such refinements are too minute for rules of social conduct. In the nature of things, there is in every transaction a succession of events, more or less dependent upon those preceding, and it is the province of a jury to look at this succession of events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time."
Applying the accepted doctrine announced in the cases to which we have referred to the facts of this case, we hold that the death of Oscar Scott was not the natural and probable consequence of the alleged wrongful act of the defendant in expelling him from its cars. All the facts and circumstances of the case show that he was able to take care of himself; that he was physically able to do so, and knew exactly what he wanted and the strength he displayed in resisting expulsion and the short time he consumed in walking over or along the tracks of the company to Springman's Crossing on his way home indicate that he was not helpless or irresponsible.
No one was produced at the trial who saw the deceased from the time he was put off the car and started back towards Minnesota avenue, until he was killed at Springman's Crossing. It was said in B. O.R.R. Co. v. Allison, 62 Md. 479: "A right of way of a railroad company is the exclusive property of such company, upon which no unauthorized person has the right to be, and any one who travels upon such right of way, as a footway, and not for any business with the railroad, is a wrongdoer and a trespasser; and the mere acquiescence of the railroad company in such user does not give *Page 615 
the right to use it, or create any obligation for especial protection. Ill. Central R.R. Co. v. Godfrey, 71 Ill. 500. Whenever persons undertake to use the railroad in such case as a footway, they are supposed to do so with a full understanding of its dangers, and as assuming the risk of all its perils. 71 Ill. 500,McLaren v. I.V. R.R. Co.; 8 Amer. Eng. R.R. Cases,
219; Jeffersonville M. I.R.R. Co. v. Goldsmith, 47 Ind. 43;Chicago R.I. P.R.R. Co. v. Houston, 95 U.S. 702; B. P.R.R. Co. v. Jones, 95 U.S. 422; 1 Thompson on Negligence,
453, 459; Morrissey v. Eastern R.R. Co., 126 Mass. 377. InMaenner v. Carroll, 46 Md. 212, which was a suit for injury received by falling into an excavation which had been dug on the private property of the defendant, over which persons were in the habit of passing, but which was not a public highway, this Court declared the same principle as controlling, and adopted the language of the Court in Hounsell v. Smyth, 7 C.B.N.S. 731, that in such case, `one who uses the waste has no right to complain of an excavation he finds there. He must take the permission with its concomitant conditions, and it may be, perils.' Binks v. R.R. Co., 3 B. S. 244; Bolch v.Smith, 7 H. N. 736, and Gautret v. Egerton, L.R. 2 C.P. 371, are cited in support of the law thus endorsed.
Inasmuch, therefore, as the presence of the deceased upon the road of the appellant at that point was a trespass, it would seem to be necessary to show some negligence, amounting to the omission of a general and imperative duty toward him notwithstanding, which ought to subject the appellant to liability in the action brought. This the appellant utterly failed to do.
It is said in 7 Am. Eng. Ency. of Law 382: "In the application of the principle that the law looks at the proximate and not at the remote, cause of an injury, lies the great difficulty in the law of contributory negligence. No general rule for determining when causes are proximate, and when remote, has yet been formulated. But the principles that *Page 616 
govern the determination of the question are well settled. When it is once established that a person injured by the negligence of another has been guilty of a want of ordinary care, it becomes necessary to determine whether such want of ordinary care proximately contributed to the injury as an efficient cause, or only remotely, as a condition or remote cause thereof. If it proximately contributed, there can be no recovery; but if it was only a remote cause or condition of the injury a recovery can be had."
We, therefore, hold that the proximate cause of the death of Oscar Scott was his own want of care in being upon the defendant's tracks under the circumstances disclosed by the evidence. The appellant relies upon the cases of Warren v.Railway, 243 Pa. St. 15; McCoy v. Millville Trac. Co.,83 N.J.L. 508; Atchison T. S. Railway v. Perry, 67 Kan. 515;Eidson v. So. Railway, 23 So. 369; Guy v. Railway, 30 Hun. 399; L. N.R.R. Co. v. Ellis, Admr., 97 Ky. 330. But those cases can have no controlling effect in this, because the facts wholly fail to bring this case within the principles announced therein. Those cases dealt with the obligations of the railway towards passengers who were, from drunkenness, or other causes, helpless and unable to care for themselves.
For the reasons stated the judgment will be affirmed.
Judgment affirmed. *Page 617