WILLETT v. KING.

1. CARRIERS—TRESPASSER—REFUSAL TO PAY FARE—EJECTION FROM TRAIN.

A person who enters a train and refuses to pay his fare when lawfully demanded is a trespasser and not a passenger, and at common law the carrier is not required to put him out at one place rather than another, provided he is not wantonly exposed to peril or to serious personal

See notes in 26 L. R. A. 129; L. R. A. 1915C, 140.

injury; but if left in a place of special and peculiar danger when he is manifestly incapacitated for looking out for himself, and is injured, there may be liability.

2. PLEADING—PROOFS—VARIANCE—CARRIERS.

Where plaintiff's declaration alleges that he was a passenger on defendants' train, but his proofs show that he was a trespasser, there is a variance between pleadings and proofs.

3. APPEAL AND ERROR—VARIANCE—WAIVER.

Where a variance between pleadings and proofs, in a cause that had twice been tried, was first raised in defendants' requests to charge, the objection came too late, since if raised at the proper time the question of plaintiff's right to amend would then have been presented.

4. CARRIERS—TRESPASSER—EJECTION FROM TRAIN—OPPOSITE DWELLING HOUSE—STATUTES.

Where plaintiff, who had refused to pay his fare upon defendants' train, was ejected a short distance from a highway on which there was a house about 55 rods from the crossing, he was put off opposite a dwelling house within the meaning of the statute (2 Comp. Laws 1915, § 8297).

5. SAME—PERSONAL INJURIES—NEGLIGENCE—DIRECTED VERDICT.

In an action for personal injuries to plaintiff who was ejected from defendants' train on his refusal to pay fare, where plaintiff walked off the train, and, beyond the fact that he was somewhat intoxicated, there was nothing to excite the belief that he could not take care of himself, and there was no evidence of a wilful disregard of his personal safety, and he was not put in peril by the trainmen, the court should have directed a verdict for defendants.

Error to Montcalm; Davis, J. Submitted June 4, 1918. (Docket No. 21.) Decided September 28, 1918.

Case by Richard Willett against Paul King and another, receivers of the Pere Marquette Railroad Company, for personal injuries. Judgment for plaintiff. Defendants bring error. Reversed.

*Parker, Shields & Brown* (*Hawley & Eldred*, of counsel), for appellants.

*L. G. Palmer* and *George E. Nichols,* for appellee.

OSTRANDER, C. J.  Plaintiff, 48 years old, a small farmer, owning 20 acres of land and working that and another 20 acres, on Saturday, March 15, 1913, drove his team of horses to Stanton, Montcalm county, put them in a barn, and by way of the Pere Marquette railroad journeyed to Lowell, in Kent county, arriving there at about 4 o'clock in the afternoon.  His principal purpose in making the journey seems to have been to get drunk and to purchase liquor to take home with him, liquor not being procurable by purchase in Montcalm county.  He became intoxicated, and, with a package containing a gallon of whisky, he left Lowell at about 7:10 in the afternoon by the Pere Marquette north-bound train.  He had sufficient money to pay his fare, and more, but bought a ticket only to Greenville, a station intermediate Lowell and Stanton.  When the ticket was taken up and he said he was bound for Stanton, he was told that he must pay fare beyond Greenville or leave the train there.  As he did not pay his fare beyond Greenville, when it was demanded he was put off of the train, which was stopped for that purpose at the Taylor or Abbey crossing, about 4½ miles from Greenville and 3½ miles from Sydney, the next station.  The train was stopped upon the highway.  The point where he alighted was a short distance south of the highway between which and himself was the usual cattleguard.  Having alighted, he told the conductor that he had left his package in the car, who got it and gave it to him.  This was shortly after 8 o'clock.  In the neighborhood of the Abbey crossing, the country is well settled.  The nearest house, Mr. Abbey's, is about 55 rods from the crossing on the south side of the highway.  It was lighted, the light being visible from the right of way.  At some time between 10 and 12 o'clock, two men,

who had walked from Greenville to the crossing, saw and talked with plaintiff, who was sitting on the ground near the rail. To these men plaintiff told his name, where he lived, that he had been to Lowell and had been put off of the train because he would not pay his fare, that he was resting and would go on when rested. He inquired, and was told, the distance to Sydney. He was invited by one of the men to go with him and remain the night, and plaintiff told him to mind his own business, he could take care of himself. On Sunday morning, one of these men, going to Mr. Abbey's house, went down the track, finding plaintiff asleep by the fence and some 40 feet from the place where he was the night before. He awakened plaintiff. Going down to the Abbey house, Mr. Abbey and this witness returned to where plaintiff was, and after some talk plaintiff went with them to the Abbey house. The jug of whisky was then from one-half to two-thirds full. Plaintiff carried it, and on the way drank from it. At the house, he had coffee, but ate no food, remained three or four hours in a warm room, complained some of a headache and pain in his stomach. About 1 o'clock in the afternoon, Mr. Abbey told plaintiff that if he was going to walk to Sydney he ought to be on his way. At plaintiff's request, the three men walked to a neighbor's house, a mile away, where was a telephone, by which a message was sent to a friend of plaintiff at Sydney. During this trip, it was contrived to tip over plaintiff's jug and lose some whisky, the remainder, about a quart, being put into a bottle, and given to him. The three men then went to the railroad at Hansen's crossing, where, at about 2 o'clock, they separated, plaintiff going up the track in the direction of Sydney. He did not proceed far. During the night, or on Monday morning, he went to an outhouse in a field, remained there, or about there, all day Monday, and in the

evening walked to Sydney and there took the train for Stanton. At some time during this outing, his feet were frozen. In May, following, one foot and part of the other were amputated. The temperature during Saturday night and Sunday, at Grand Rapids, was, at its coldest, 18 degrees, at midnight, Saturday. It was 9 degrees between 5 and 7 o'clock the morning of the 17th, Monday morning.

In outline, these are the facts appearing upon the trial and are not disputed. Aside from the question of the amount of damages plaintiff should recover, there were three questions of fact submitted to the jury. One was whether, in fact, plaintiff was discharged from the train opposite a dwelling house, within the meaning of the statute, 2 Comp. Laws 1915, § 8297, which reads:

"If any person shall refuse to pay his fare, or refuse to obey such regulations as may be established for the convenience and safety of passengers, it shall be lawful for the conductor of the train and servants of the company to put him off the train at any usual stopping place, or opposite any dwelling house the conductor may select."

Another question was whether plaintiff's feet were frozen before Sunday morning, when he went to the Abbey home, or were frozen afterwards. The third question involved, as the charge was given, determination of plaintiff's condition when he was put off of the train, and not only his actual, but his apparent, condition, and his discoverable condition.

The form of the action is trespass on the case. Allegations therein proceed upon the premise, or after statement of the premise, that, having been accepted as a passenger upon the train, various duties were owed to plaintiff by the trainmen. Among the duties alleged, generally, is the duty not to eject him or put him off of the train at any point except at a usual

stopping place or opposite to some dwelling house, and the further duty to see to it that he was not exposed, in his alleged condition, to unusual hazards, to weather or other conditions which might cause him injury. Performance of these duties is negatived. The declaration does not *count upon* the statute, nor refer to it, nor does it refer to the fact that plaintiff was put off of the train because he did not pay his fare.

There was a substantial verdict for plaintiff, upon which judgment was entered. There are 41 assignments of error discussed in the brief for appellants, under the headings, Admission of Demonstrative Evidence, Plaintiff's Poverty, Opinion of Witnesses, Argument of Counsel, The Court Should Have Directed a Verdict for the Defendant, Errors in the Charge as Given.

The verdict being general, with no special finding, it is not possible to know what action of the trainmen the jury condemned. The jury was advised that, having refused to pay his fare when it was demanded, the plaintiff was a trespasser, liable to be ejected from the train, the right to eject him being limited by the statute provision above quoted. That nominal damages, at any rate, were recoverable if the ejection was at a place not within the statute designation. And whether the place was opposite to a dwelling house was to be determined by them. It is assumed that they observed and followed the instructions given them by the court. These required them to find that plaintiff's feet were frozen during Saturday night before plaintiff was in a safe place in the Abbey home. They required them to find either that plaintiff was ejected from the train at a point not opposite to a dwelling house, or whether opposite to a dwelling house or not, that he was ejected when his evident, or apparent, or discoverable, condition forbade that

he be ejected at all except at a place where he would be looked after, as at a station. As a general summary of the instructions upon the point, the court said:

"So you see much rests, gentlemen, upon the question whether under all of those conditions the conductor had reason to believe, or ought to have believed from his observations, or should have discovered whether the man was able to take care of himself at that particular time and place."

The defendants requested the court to charge that:

"Under the testimony in this case the plaintiff was a trespasser and not a passenger upon the train in question at the time he was ejected therefrom by defendants' conductor. Under those circumstances the conductor had the right and it was his duty to eject him from said train at any usual stopping place of said train or opposite to or near a dwelling house unless said defendant (plaintiff?) was so drunk that he did not know or comprehend what he was doing, and could not care for himself, and unless the conductor had full knowledge of his helpless condition, and notwithstanding such knowledge, grossly and wantonly put him off the train under such circumstances as might be naturally and reasonably expected to result in injury and damage to said plaintiff, and with reckless disregard of plaintiff's safety."

Further requests emphasized the defendants' contention, as, for example, the request that:

"It is not sufficient to entitle the plaintiff to recover in this case for him to establish that in ejecting him from the train the conductor did not exercise ordinary and reasonable care under the circumstances of the occasion; but it is incumbent upon him to go further and establish the fact by a preponderance of the evidence that the conductor in ejecting him from the train on that occasion knew that he was in a condition in which he was unable to help and care for himself and was guilty of gross and wanton disregard of his rights and safety in expelling him from the train.

"Unless you find in this case that the conductor ejected the plaintiff from the train on the night in question when plaintiff was in a helpless condition and when the conductor knew of said helpless condition and under such circumstances as indicated a gross and wanton disregard of plaintiff's rights and of the injurious consequences which might reasonably be expected to result to him the plaintiff cannot recover."
* * *

Other requests preferred by defendants ask for a peremptory instruction in their favor, one because there is a variance in pleadings and proofs in that the declaration alleges that plaintiff was a passenger and had the rights of a passenger, while the proofs show he was a trespasser, to whom defendants owed none of the alleged duties owed to a passenger; another because plaintiff's own negligent acts and conduct contributed to whatever injury he sustained; another that having been discovered and invited to a place of safety after he was ejected and before he received injury defendants were then and there relieved of any further duty or obligation in the premises; another that there is no proof showing that plaintiff had received injury before the time when he was admitted to the house of Mr. Abbey on Sunday morning; and still another to the effect that there is no evidence that the conductor in ejecting plaintiff acted with gross or wanton disregard of plaintiff's rights, and that the jury might not speculate with regard to whether plaintiff received his injuries on Saturday or on Sunday night.

It has been many times decided that if a person enters a train and refuses to pay his fare when lawfully demanded, he is a trespasser and not a passenger, and at common law the carrier is not required to put him out at one place rather than another, provided he is not wantonly exposed to peril or to serious personal injury.  3 Elliott on Railroads, § 1255; 4

Elliott on Railroads, §§ 1583, 1637; *Wyman* v. *Railroad Co.*, 34 Minn. 210 (25 N. W. 349) ; *Podespik* v. *Railway Co.*, 216 Mass. 213 (103 N. E. 638). Of course, if such a person is, in any case, left in a place of special and peculiar danger when he is manifestly incapacitated for looking out for himself, and is injured, there may be liability for the injuries. *Black* v. *Railroad Co.*, 193 Mass. 448 (79 N. E. 797, 7 L. R. A. [N. S.] 148, 9 Ann. Cas. 485). In *Gaukler* v. *Railway Co.*, 130 Mich. 666, plaintiff was put off of a train, having refused to pay his fare. The negligence complained of was (1) that he was left in a place of danger, (2) abandoning him to look out for himself when he was incapable of doing so by reason of his intoxication. Plaintiff was afterwards injured ·by a passing engine, which struck him while he was walking between two tracks on the railroad right of way. In reversing the judgment for plaintiff, this court said:

"The testimony of these two officers is all that shows that the man was put off near Farnsworth street, instead of at the Lake Shore junction, and they agree that he. left the track, and went with them to the flagman's shanty, 25 or 30 feet east of the tracks. We may treat the case, then, as though he had been left at that point, and taken 25 or 30 feet from the tracks, in a public and well-frequented street in the city, and left in the presence of two citizens, and the question of the fitness of the place where the train stopped is eliminated. In this respect the case is like that of *Hamilton* v. *Railroad Co.*, 183 Pa. St. 638 (38 Atl. 1085), where one walked back to a station after being carried by, and was there injured. The court said it was as though he had gotten off at the station.

"Plaintiff's counsel insist that it must be left to the jury to say how drunk the man was, and whether, under the circumstances, it was negligence to put him off. We should add to that, 'And leave him 25 feet east from the tracks on a public highway, in the presence of two officers, who were conservators of the

peace.' The evidence in this case is practically undisputed. Every witness who testified said that the man could walk and could talk. He knew that fare was required of him, and he insisted that the conductor should carry him for the same fare that the electric line charged; and, when he was informed that he could not do so, he refused to pay more, and at once acquiesced in the conductor's demand that he leave the train. He alighted unaided. He then left the track to go to Detroit, found some citizens and inquired the way, but declined to go with them. All knew that he had been drinking—perhaps considered him drunk—but the testimony of no one indicates that he was unable to care for himself. All, from the saloon keeper—who testified that he was in the habit of keeping track of his patrons' trains, that they might not miss them, so that they might freely drink all that they were disposed to buy, and who obligingly assisted them to their respective trains—to the last man to talk to him, agree that he was able to care for himself, though drunk. There is nothing on this record to make it incumbent on this conductor to do more than to see that this man, in his apparent condition, left the railway premises, and was talking with citizens 25 feet away from a point of danger. If there was any negligence at any stage of the proceeding—which we do not intend to intimate—it ceased as a factor in this case when the plaintiff left the premises and reached a place of safety."

In considering a similar case in which a Canadian statute was relied upon, this court said, in *The Great Western Railway Co.* v. *Miller*, 19 Mich. 305, 313:

"The liability for putting a person off from the cars at a distance from any dwelling, or station, is purely statutory, and no damages can be recovered for that specific grievance, unless the statutory provision is set out and a case made out under it by the pleadings. A carrier is not required by the common law to put out a trespasser at one place rather than in another, and while the law will not permit a person to be exposed wantonly to peril, there is no rule which requires any consideration to be shown for the mere convenience of a wrong-doer."

The variance of pleadings and proofs is clear. The declaration alleges that plaintiff was a passenger and alleges, by intendment, at least, various positive contract duties arising out of the relation of carrier and passenger. The case made by plaintiff upon the testimony negatives the existence of any contract or of any positive duty owed to plaintiff.

The statute aside, the plaintiff's case upon the testimony is the case of one not a passenger, but a trespasser, with whom the carrier had no contract relations, to whom no positive duty was owed, but only the non-positive duty not to wilfully do him injury. This point was not raised during the trial—at least, we are referred to no ruling and no exception which presents it—nor until the testimony was concluded and defendants' requests to charge were preferred. If it had been made when plaintiff's testimony showed that he was not a passenger, or perhaps upon a motion to strike out all of the testimony for plaintiff, with a ruling favorable to defendants, the question of plaintiff's right to amend would then have been presented. This cause has twice been tried. We think the objection came too late, and that the judgment ought not to be reversed for this reason.

So far as the statute is involved, the contention may be disposed of by the facts. The court should have instructed the jury that the point at which plaintiff alighted was opposite a dwelling house, within the meaning of the statute. As used in the statute, the word means: Placed over against; standing or situated over against or in front; facing; often with *to;* as, a house opposite to the Exchange. Webster's Inter. Dict. Since 1855, this provision has been in the statutes. It is a limitation upon a common-law right. Applicable to nearly all railroads in the State, in all portions of the State, it must have been in-

tended as a humane provision to secure a rejected or ejected passenger reasonable means of communicating with his fellows. The house in question was little more than one-eighth of a mile distant, and was in view. In a city like Lansing, the distance was a little more than the length of two city blocks and the intervening street.

Plaintiff went to the station at Lowell, purchased a ticket and boarded the train. After leaving Greenville, he tried to borrow money to pay his fare, the conductor waiting his success in that behalf. He walked off of the train. He demanded his jug, and it was given to him. Beyond the fact that he was somewhat intoxicated, there was nothing to excite the belief that he could not take care of himself. There is no evidence of a wilful disregard of his personal safety. He was not put in peril by the trainmen. His only peril was from the elements, and that was inconsiderable unless he was for a long time exposed to them and was himself inactive. He was offered and refused shelter for the night, after learning where he was. But, he says, he immediately addressed himself to the jug and its contents. When he was found, in the morning, asleep, and apparently safe and sound, the jug was from one-half to two-thirds full. Plaintiff is to be pitied, but it would be plain injustice to require defendants to repair, so far as money can repair, the consequences of his own folly.

We are of opinion that the court should have directed a verdict for defendants. In this view, it is unnecessary to discuss other assignments of error.

BIRD, MOORE, STEERE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.