## CORNELIUS VEENSTRA *vs.* UNITED RAILWAYS AND ELECTRIC COMPANY.

*Carriers—Duty Towards Intoxicated Passenger—Ejection in Unsafe Place—Evidence.*

A railway company, in ejecting an intoxicated passenger, must exercise reasonable care to see that he is not abandoned at such a place or under such conditions as to expose him to unnecessary danger.                              p. 521

There being evidence that plaintiff, while stupefied from intoxication, and not having reached, or having been carried past, his destination, was, without any demand of the additional fare then collectible, ejected and left alone at night in an unlighted waiting shed located in an angle formed by intersecting railroad tracks, and that he was lurching from the shed towards the car as it started away, *held* that the question of the carrier's negligence was for the jury, in an action for personal injury as a result of his being struck by another car of the same company.                              pp. 519-521

In an action for injury to a passenger ejected at a lonely station while intoxicated, evidence that the conductor, when about to eject him, was warned by another passenger of the danger of so doing under the circumstances, was admissible.
p. 523

*Decided June 11th, 1925.*

Appeal from the Circuit Court for Harford County (HAR-LAN, J.).

Action by Cornelius Veenstra against the United Railways and Electric Company of Baltimore. From a judgment for defendant, plaintiff appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, PARKE, and WALSH, JJ.

*Thomas H. Robinson* and *Charles F. Harley,* with whom were *William M. Travers* and *Michael James Manley* on the brief, for the appellant.

*Edward J. Colgan, Jr.,* and *Stevenson A. Williams,* with whom was *J. Pembroke Thom* on the brief, for the appellee.

URNER, J., delivered the opinion of the Court.

The plaintiff, while in a drunken stuper, was ejected from the defendant's car, on which he was traveling as a passenger, and was soon afterwards injured by another car on the same railway. The question is whether the circumstances proved were such as to admit of a rational inference that the employees of the defendant, in their removal and disposition of the plaintiff, failed to exercise the care for his safety which his condition required. At the close of the evidence for the plaintiff, the case was withdrawn from the jury, and the exception to that action is the principal one presented by the appeal.

It was about ten o'clock at night when the plaintiff boarded at Highlandtown the defendant's car bound for Sparrows Point. Although he had been drinking freely and was intoxicated, he appears to have entered the car unassisted. He sat down on a longitudinal seat close to the rear entrance. It is inferable from the evidence that his fare was collected. While his memory of the incident was very uncertain, he testified that he mentioned Sparrows Point to the conductor

as his destination.    He was removed from the car when it reached Dundalk Junction about half past ten.    Several passengers who boarded the car at an intermediate station were called as witnesses for the plaintiff and describes his conduct on the car and the circumstances of his removal.

The first witness testified that "when he got on the car he saw the plaintiff, * * * sitting on the end of the long seat on the left-hand side of the car, in the rear; that the plaintiff was sitting there mumbling to himself, and was in a very helpless condition, * * *.    The foundry was the next stop and we went by that.    That was a free zone and it was that time that the conductor started to take up the fares from Dundalk to Sparrows Point, * * * he was about halfway through the car when the car came to a stop at Dundalk Junction * * *.    The conductor came back and took hold of this fellow and says, 'Come on—here's where you get off'; and drug him to the door; and when he got there, as if it had been pre-arranged, the motorman was waiting there to help the conductor; and after they got him off the car and let go of him, he fell down.    Then they took hold of him again and took him to the shed, and the conductor stayed there till the motorman got on the car, and then the conductor ran, got on the car and the car pulled out."

The witness further stated that the plaintiff was sleeping when approached by the conductor; that he was not asked for any fare, that he was unable to walk, or to rise from the ground when he fell after being taken off the car, that it was a dark night and there were no lights in the place to which he was removed, and that he made an effort to return to the car after the conductor left him in the waiting shed.    A written narrative of the occurrence, given by the witness on the following day, and produced by the defendant in the course of his cross-examination, included statements that the conductor "asked this man where he wanted to get off.    The man said, 'St. Helena' (a station which the car was just leaving).    The conductor gave the motorman one bell.    The car did not stop but continued on.    The conductor then went

to the motorman and said something to him. When the car reached Dundalk Junction it came to a stop. The conductor then came back and took hold of the man, who was asleep, and dragged him to the door. The man woke up and conductor said 'This is where you get off.' The motorman was on ground. They took man off. He was very drunk. He could not stand alone. Several men on car made some remarks to conductor about why didn't he take the man somewhere so he could be taken care of. The crew then carried man in the waiting station and sat him down. Both then jumped on car and started away. The man got up and started towards car. This is last I saw of him. It was very dark at junction as no lights were lit."

The testimony of the plaintiff, after indicating the quantity of intoxicating liquor he had consumed before he started home on the defendant's car, was in part as follows: "I remember I went in a street car. After I came in the street car, I paid my fare or some one else paid it—there was no trouble about the fare that I know of. I had a seat and after a while the conductor comes back and picks me up, and I thought the man wanted a fare, and I tried to get the fare out of my pocket. Then I heard some one shout, 'I will pay that man's fare.' I don't know what it was about, and I know I wanted to pay my fare. I know that I was drunk and helpless in mind and body. * * * I know I had my fare, and I know they threw me off, but I don't know where I was. I know I went on the ground, and I tried to get up when I saw a light—I tried to get back to the light, and then I went down. Q. Could you get up? A. No, sir. * * * Q. Where did you want to go? A. I wanted to go to Sparrows Point. Q. Do you remember telling any one that? A. I do remember I was asked where I wanted to go and I said to Sparroys Point. Q. To whom did you say that? A. To the conductor when I come on the car. Q. And that is the last you can remember until what time? A. After I fell down then, I don't know any more until I came to in the hospital, and they told me that I had my foot off. * * *." On cross-

examination the plaintiff was asked: "Don't you remember getting on the street car? A. I thought I was getting on the street car, and I don't know that there was anything wrong with me. The next day when I came to, I thought and tried to think what went on then. I thought when I came on the car, I was all right; and I know that, when I had been on the car I kept getting worse and worse. * * * Q. Do you remember after you got off the car? A. Yes, sir. Q. What kind of a place were you in? A. I have no idea. * * * I saw lights and I wanted to get back to the lights. * * * I know that, after three or four steps, I went down. Q. What lights are you talking about that you saw? A. Lights from the street car. * * * I wanted to get back. I take a couple of steps and drop again, and I don't know any more afterwards."

A passenger on a car of the defendant, bound for Sparrows Point, next succeeding the one from which the plaintiff was ejected, the difference in the time of arrival of the two cars at Dundalk Junction being about fifteen minutes, testified that when the car in which he was riding had nearly reached the junction, "the motorman gave a sharp blast of his whistle and the car came to a sudden stop, probably in a little over the length of itself; that he saw a man (the plaintiff), lying under the street car between two dead rails; that the motorman and conductor carried the plaintiff around to the back of the car and laid him on the cinder platform at the station; that the plaintiff was bleeding and he seemed unconscious and his leg was crushed; that it was dark at the point where this accident happened and the only light there was was that from the lights in the street car. * * * Q. How far away from that station was it that this man was injured? A. Really where the car run over him—that rail, I would judge was about fifteen feet or possibly a little further from that station. * * *" On cross-examination he testified that "he thinks the front wheels of the car were all that ran over him, and that the motorman made a quick stop of the car and that he was not running very fast."

The records of the hospital to which the plaintiff was taken after the accident show that he was "practically unconscious from intoxication."

The following are extracts from the testimony of another witness, who was on the rear platform of the car upon which the plaintiff was a passenger: "When we were at Dundalk Junction, the conductor was about the middle of the car collecting fares. He came back in an awful hurry, opened the door, grabbed this man and pulled him off the car. About the time he stopped the car, the motorman was there. They carried him off five or six feet on the railroad platform and the minute they released him he fell down. * * * The conductor and motorman literally dragged him back to the shed and sat him down. Then the motorman got on the car—the conductor released the man, jumped on the car and the car pulled out. I looked back and the man came sprawling out the shed * * *. Q. And about the time the conductor got on the car the man got up? A. Yes, sir—just about the same time the conductor got on the car. Q. Did he come towards the car? A. Yes, sir. Q. How far did he come? A. He was just out of the shed when the car started. * * * He was sprawling and trying to keep his feet. * * * Q. These cars are brightly lighted, are they not? A. Yes, sir. * * * Q. And these lights throw a glow for a considerable distance from the car, don't they? A. Yes, sir. Q. So that you had no difficulty in seeing this man when he was coming towards the car, did you? A. When the car started, I could see him coming; and in a little while I could not see him."

A witness who sat just opposite the plaintiff in the car testified partly as follows: "When I first looked at the man, I thought he was sleeping. * * * Q. Was he disturbing the peace in any way? A. None that I saw. Q. Was he doing anything disagreeable? A. No, sir. * * * Q. Now, how long did he stay on the car after you got on? A. Until we got to Dundalk Junction. * * * Q. How far is that from Dundalk Station? A. It is the second station after you leave Dundalk Station. * * * The conductor was taking up

fares. He stopped taking up fares about the middle of the car, came back, grabbed hold of this man and took him off the car. * * * He just grabbed hold of him and said 'This is where you get off.' I didn't hear the man say a word. * * * Q. Outside of the lights that were there on the car, did you see any other lights about the place? A. No, sir. Q. Was it a light or dark place outside the lights that were on the car? A. It was a dark place. Q. Very dark? A. Yes, sir. Q. How many tracks are there in that vicinity? A. There are two for the Sparrows Point line, one for the Riverview line, and then the Pennsylvania Railroad has some tracks there too."

A man who seated himself beside the plaintiff, after boarding the car at Dundalk Station, testified that the conductor was then taking up fares, and the plaintiff "was sitting there kind of stupid. * * * The conductor came by shortly after that and said to him in a sharp tone, 'I thought I told you to get off in St. Helena.' * * * Q. What did Mr. Veenstra say? A. He never answered him—he didn't say a word. * * * Q. What was done after the conductor went on through the car? A. He went to the front end of the car, stood there a moment and then started to take up fares again. * * * I spoke to this man and said, 'Where do you want to get off,' but he didn't answer me. Then I said to him, 'If you want to get off at St. Helena, you had better get off at the Maryland Swimming Club now—it is a free zone and they will carry you back.' He didn't answer me then either. When the conductor was about half way through the car collecting his fares—he had started at the front end of the car—he walked back and grabbed this man * * * and took him off the car. The conductor said to the man, 'This is where you get off,' and grabbed him without saying another word to him. * * * Q. Was anything said to Mr. Veenstra about fare before the conductor took hold of him? A. No, sir. Q. Did any one say anything about the man's fare while he was being put off? A. Some one raised up in the middle of the

car and said, 'I will pay his fare,' that was when they had
him at the door. * * *" .

Another passenger testified "that he sat in the rear of the
car on the floor where it is elevated above the platform; that
he saw the plaintiff sitting on the long seat on the left-hand
side of the car; that the plaintiff did not appear to be doing
any more than minding his own business, * * *. When we
got to Dundalk Junction, he came past me with the conductor
having hold of him, and when they got to the steps, the mo-
torman helped to get the man off. When they let go of him
he fell down. * * * They took him out by force because the
man didn't seem to be able to walk."

The last witness for the plaintiff was questioned as fol-
lows in regard to the conditions surrounding the station be-
side which the plaintiff was ejected and injured: "Q. Will
you describe to the gentlemen of the jury the character of
the land about the station—what is back of this station? A.
Back of the station is an embankment of probably three or
four feet, and that embankment has a dense thicket on it.
Q. Now, to the right of the station, if you were at the sta-
tion and were going to the right as you look out of the station
what would you have to pass? In order to get away to the
right of the station, what would you cross? A. To go to the
right of the station, you would have to cross railroad tracks.
Q. And to go away to the left of the station? A. You would
have to cross railroad tracks. Q. Suppose you were going
out straight in front of the station? A. You would have to
cross railroad tracks. Q. And, if you went from the back
of the station? A. You would have to go up that embank-
ment and into that thicket."

The material facts proved by the testimony quoted are
that the plaintiff, in a state of intoxication, was accepted as
a passenger on the defendant's car, and his fare was col-
lected; that he was quiet and inoffensive during the half
hour of his journey; that before his removal he had sunk
into a condition of stupefaction; that he was ejected without
any demand or refusal of the additional fare which was then

collectible; that he was placed and left alone at night in an unlighted waiting shed located in an angle formed by intersecting railroad tracks, and that he was lurching from the shed towards the tracks when the car on which he had been a passenger was started on its way. The reason for his expulsion from the car at the time and place selected is not clear from the evidence. Dundalk Junction was not his destination according to either his own intention or the conductor's probable understanding. Apparently the conductor understood that the plaintiff wanted to alight at St. Helena, but he was not discharged at that point. He was conveyed beyond that and the next station, and finally expelled and abandoned, according to the testimony, at a place and time of special danger to a person in his condition of helplessness. Upon the evidence presented, the case does not involve the right of those in charge of a railroad car to eject an unruly passenger or one who refuses to pay his fare. It is a case in which an intoxicated, but orderly passenger, who, having been carried past, or not having reached, his indicated or intended destination, is removed from the car and left alone in the dark at a waiting shed from which he was "sprawling" in the direction of the railroad tracks at the moment when the car from which he had been taken by the conductor and motorman was again set in motion. The apparent effort of the plaintiff to return to the car was noticed by one of the passengers and was observable by the conductor also if he looked back when he "jumped" on the car after the plaintiff had been "released." A proper concern for the plaintiff's safety might well have prompted a glance to see if he was remaining in the position in which he had been placed. The trainmen could not judicially be declared to have exercised due care for the plaintiff's safety, if they left him with knowledge that he was then staggering on to the track in an effort to regain the car.

In 4 *R. C. L.* 1162-3, it is said: "Generally speaking, a common carrier is not bound to protect intoxicated persons from the consequences which result from their own wrongs

or follies. Still it owes them some duties, and cannot negligently suffer harm to come to them while they are passengers. Though under no obligation to accept as a passenger one who is intoxicated to such an extent as to render him offensive to others, or to incapacitate him from caring for his own safety, yet when a carrier receives one as a passenger, unattended, knowing him to be at the time in an insensibly drunken condition, it is bound to exercise all the care that a reasonably prudent man would to protect one in such condition from the dangers incident to his surroundings and mode of travel, and it must, in such case, bestow upon him such care and attention, beyond that given to the ordinary passenger, which reasonable prudence and foresight demand. * * * It has been held to be the duty of a carrier to use reasonable care in looking after a passenger helpless from intoxication after he has left the train, and that train men who attempt to assist an intoxicated passenger from the train are bound to use ordinary care to leave him where he will be reasonably safe in view of his condition."

Many cases are cited in support of the following statement in 10 *C. J.* 755: "Where a passenger is in such a helpless condition that he is unable to take in his position and the surrounding perils or to avoid them, and this fact is known to the employees of the carrier, and he is ejected at a place which is dangerous to one in his condition, the carrier is liable for the damages resulting from such action; and if in such a case he is run over by a following train, the carrier is liable, although the employees in charge of the second train used all ordinary care and diligence to avoid the accident. Thus the rule applies where the conductor with knowledge of the facts ejects a passenger who is intoxicated to such a degree as to render him unconscious of danger, at a time or place dangerous to one in his condition."

In regard to the right of a railroad company's employees to eject a passenger it is said in 2 *Elliott on Railroads* (3rd ed.), 2487: "If he is so intoxicated or so young or feeble as to be unable to take care of himself or look out for his

own safety, the company should exercise reasonable care to see that he is not expelled or abandoned in such a place or under such circumstances that he will be exposed to unnecessary perils."

Among the cases applying the general doctrine thus stated are *Warren v. Pittsburg & B. St. Ry. Co.*, 243 Pa. St. 15; *Willett v. King*, 203 Mich. 295; *Black v. New York, N. H. & H. R. Co.*, 193 Mass. 448; *Haug v. Great Northern R. Co.*, 8 N. Dak. 23; *Macon, D. & S. R. Co. v. Moore*, 125 Ga. 810; *Hudson v. Lynn & B. R. Co.*, 178 Mass. 64; *Louisville & N. R. Co. v. Tuggle*, 151 Ky. 409; *Kradel v. Pittsburg, H. B. & N. C. Ry. Co.*, 255 Pa. St. 427; *Bennett v. Seattle Electric Co.*, 56 Wash. 407, 105 Pac. 825; *Louisville & N. R. Co. v. Johnson*, 108 Ala. 62, 31 L. R. A. 372; *Fagan v. Atlantic Coast Line R. Co.*, 220 N. Y. 301. A number of decisions on the subject are cited in *L. R. A.* 1915C, 140; 7 *L. R. A.* (*N. S.*) 148, and 19 *L. R. A.* 327.

In the case of *Murphy v. Boston & M. R. Co.*, 216 Mass. 178, cited in the appellee's brief, there was said by the court to be "no contention that the station to which he (the passenger) was removed was not reasonably safe," and in *Podespik v. Worcester C. St. R. Co.*, 216 Mass. 218, cited in the same brief, the case was said in the opinion not to be one where the plaintiff "had been left in a place of special and peculiar danger when he was manifestly incapacitated from looking out for himself."

*Price v. Phila., W. & B. R. Co.*, 84 Md. 506, upon which the appellee placed reliance, was not a case arising from the expulsion of a passenger, but involved an injury to an intoxicated trespasser on the railroad, while in *Scott v. Wash., B. & A. Elec. R. Co.*, 130 Md. 603, similarly relied upon, the ejected passenger, as the court said, "was by no means in a physically helpless condition," and the opinion by Judge Burke distinguished cases cited, including *Warren v. Pittsburg & B. St. Ry. Co.*, *supra*, and others, because they "dealt with the obligations of the railway towards passengers who

were, from drunkenness, or other causes, helpless and unable to care for themselves."

The issue raised on the proof in the present record, in our opinion, is one of fact to be determined by a jury and not one of law to be decided by the court.

In view of the circumstances proved, we do not feel justified in holding that a rational inference of negligence on the part of the defendant's employees, in their treatment of the plaintiff as a passenger, was legally impossible. Due regard for the rights of the carrier does not prevent a conclusion that, under the special conditions shown by the evidence in this case, the plaintiff was entitled to have the jury consider whether or not the action of the trainmen was negligent and the proximate cause of his injury.

There are three exceptions relating to the admissibility of testimony. When a witness was describing plaintiff's removal from the car he was asked, "Did you call to the conductor?" An objection to this question was sustained. The witness was then asked, "What, if anything, did you say to the conductor at that time?" This question was also objected to, and counsel for the plaintiff stated to the court, "We propose to prove by this witness that the situation was exceedingly dangerous, and this witness at the time warned the conductor of the danger," but the court disallowed the question. The first and second exceptions relate to those rulings.

The utterance objected to was sought to be proved as an incident of the event under inquiry. It would have indicated that the question of the danger to which the plaintiff might be exposed, by his expulsion and abandonment at the time and place described, was one which the conductor had ample reason to consider. In our opinion the statement was relevant and should not have been excluded.

There was no reversible error in the ruling on the third exception.

> *Judgment reversed with costs, and new trial awarded.*