## Casteel et al. v. American Airways, Inc.

(Decided Dec. 20, 1935.)

W. A. HUBBARD and R. L. POPE for appellants.

WOODWARD, DAWSON & HOBSON for appellee.

Opinion of the Court by Stanley, Commissioner—
Affirming.

These cases are of first impression. They are
consolidated suits for damages for ejection of pas-
sengers from an airplane.

Ford Casteel and wife, Mrs. Frieda Casteel, were
citizens of Laurel county, Ky. He was afflicted with
tuberculosis, and they had been residing for some time
in New Mexico. On October 5, 1933, they took passage
on appellee's air line from El Paso, Tex., to Louisville,
Ky. He was permitted to travel in pajamas and a robe.
It is alleged in the petitions that they were carried to
Fort Worth, Tex., and without just or legal cause
wrongfully removed from the plane and put off in a
strange city without means and compelled to wait there
for five hours until they were transported at the de-
fendant's expense by railroad to Louisville. The pe-
titions charged that because of the wrongful act of the
defendant each was weakened and permanently im-
paired in health due to the change and prolonged trans-
portation. Humiliation, exposure, and mental and
physical distress and discomfort were averred.

In the petition of Ford Casteel's Administrator it
was further charged that the defendant allowed and
suffered another passenger on the ship to impose and
mistreat the decedent by leaning against him, and that
the defendant so operated the plane for at least 200
miles "in an improper manner by suddenly and unnec-
essarily shunting it upward and instantly shifting its
course downward in such a way and manner as to jerk
and shake" him unnecessarily, and "endeavored in
divers ways to make it so uncomfortable and unpleas-
ant as to try to cause him to ask to leave said airship
of his own accord," but he refused to do so, and pro-
tested against removal. The answers presented a

traverse, justification, and consent by the passengers to discontinuance of the journey by plane. The defendant also pleaded a regulation promulgated by the Treasury Department of the United States governing transportation in interstate commerce by air and placing a quarantine upon passengers afflicted with pulmonary tuberculosis; but this went out on demurrer, it appearing that the regulation, filed as an exhibit, did not prohibit the transport of such afflicted persons if certain provisions for their care and the protection of other passengers should be made, and the pleadings did not negative the existence of such provisions.

After the joint trial had commenced, amended petitions were tendered which alleged certain profane language intended to apply to the plaintiffs' mistreatment during passage by another passenger, and negligence in failing to provide suitable protection for the sick man from exposure to inclement weather. The court properly refused to allow the amendments to be filed at that stage of the case. We shall therefore consider only the evidence coming within the pleadings and pass over that pertaining to circumstances apparently embraced by the amendments, which, it was said, indicated a hostile attitude or atmosphere of displeasure over the presence of the sick man.

The carrier sold the tickets with full knowledge of Casteel's condition. We state the testimony of Mrs. Casteel: Before reaching Fort Worth, the pilot navigated the ship up and down and sideways in a rough manner, which made her husband sick. But neither of them made complaint. Change in planes was to be made at Fort Worth. When the machine arrived there, Casteel was carried into the port. A doctor felt his pulse and advised that he should not continue by plane, but ought to finish the journey by rail. Both she and her husband protested. She told the doctor that her husband's physician had administered medicine to prepare and enable him to make the journey by plane, that he could not stand the long trip by train, which was the reason they were traveling that way. She asked to be allowed to go on, but was told she could not. An agent asked to see the tickets, and when she gave them to him he stated they could not be taken farther and her money would be refunded. Neither consented to the surrender of the tickets nor to continuing by train. A

check was given her representing the proportionate fare to Louisville, and she signed a refund receipt. The company had them taken to a first-class hotel and bore all expenses. The company made arrangements for the railroad tickets and paid for them out of the refund check. The amount was something less. It also provided transportation to the station. They traveled in a pullman drawing room and changed trains only at Memphis. They arrived in Louisville the next afternoon, experiencing a delay of about 29 hours. The company had sent a message to those awaiting their arrival by plane. Mr. and Mrs. Casteel remained in Louisville five days because he was unable to go to his home in Laurel county. He was taken there by automobile, a distance of 150 miles, and died a week later of tuberculosis.

Mrs. Casteel testified to humiliation because of her experiences and of having been worried and made nervous, weak, and exhausted. The expense in Louisville was about $40. A local doctor testified that when Casteel arrived home he was in a serious condition, and in response to a hypothetical question expressed the opinion that the experience had hastened his death. However, the doctor had no personal knowledge of travel by air.

According to the defendant's evidence, the dispatcher at El Paso advised against the sick man embarking and informed him and his wife that it would depend on how he stood the trip as to whether or not he would be taken off at Big Springs or Fort Worth or carried to his destination. They were told of the conditions which might be expected and the ill effects likely to ensue; but they insisted on going on. The plane was delayed a few minutes on this account. This evidence was contradicted by Mrs. Casteel. En route the pilots observed the effect on the sick man and did the best they could to avoid disturbance by changing altitude gradually and otherwise operating the plane in an unusually careful manner. El Paso is 3,900 feet above sea level, and it was necessary to ascend 6,500 or 7,000 feet through the mountains and descend to 650 feet, the elevation of Fort Worth. During the last six minutes the ship encountered head winds. The station at Fort Worth was radioed to have a doctor meet the plane.

The man was very ill and in a helpless condition. He was carried into the station and Dr. W. H. McKnight, a well-qualified physician, made a careful examination of his heart and lungs. He found him in the last stages of tuberculosis and experiencing considerable distress in breathing. He had a very poor heart action and looked as if he would die soon. The doctor advised that he was not able to continue, that it would be dangerous for him to go on by air and much safer to finish the journey by rail. The evidence of the defendant is that the passengers acquiesced and appeared satisfied that the best thing to do was to go by train. The doctor gave professional reasons why it would not have been safe for a man in his condition to travel by plane. Courtesy and due attention were shown the passengers.

Mrs. Casteel denied the testimony of the several witnesses as to agreement or consent of herself and husband.

At the beginning of the trial the defendant's offer to confess judgment in each case for $50 was declined. At the conclusion of all the evidence, the court directed the jury peremptorily to find a verdict for the defendant. The appeals are from judgments entered thereon.

The nature of the defendant's business is, obviously, conceded to be that of a common carrier of passengers. It has been several times so declared. "Transportation, as its derivation denotes, is a carrying across, and, whether the carrying be by rail, by water or by air, the purpose in view and the thing done are identical in result" Curtiss-Wright Flying Service v. Glose (C. C. A.) 66 F. (2d) 710, 712; Conklin v. Canadian-Colonial Airways, 266 N. Y. 244, 194 N. E. 692.

The obligation of a common carrier to receive and transport passengers and freight without discrimination in choice or accomodations has come down to us from medieval England, where, because of the communal and feudal life or political and social conceptions, many trades and businesses were required to serve alike all who applied, such as the miller, the victualler, the clothier, the farrier, and the innkeeper. Travel and transportation of goods being hazardous, the merchant was dependent upon the caravaneer, hoyman, and lighterman, so that it was early decided that the carrier was

liable in damages for refusing to accept goods for transport. The logical development was to make the same application in respect of travelers. The word "common" addressed itself to the exercise of a public calling, so they became "common carriers."

Succeeding periods of history witnessed the overthrow of the feudal system and the destruction in whole or in part of other governmental and economic theories. In the evolution there was a tendency to depart from the control or interference in private business affairs by the government in behalf of the public. The Colonies, fresh from England, framed their Constitutions in such a way as to preserve much greater freedom to individual property rights than had theretofore been enjoyed. However, it was still found necessary to adhere to many of the traditions of the mother country, so that when private property was used for a purpose which became essential to public welfare, it became impressed with the duty to serve the public just as were the industries of the same class in ancient times, the reasons remaining practically the same.

So, from the beginning of our jurisprudence it has been recognized as the duty of a common carrier to accept and carry without discrimination those who offer themselves for transportation because of the dependence of the public and the demands of its welfare, presupposing, of course, the tender of the proper compensation by one to whom there could be no legal objection. It is, as well, the recognized duty of a carrier to transport its passengers safely to their destination. This extraordinary responsibility of private business, based upon considerations of public policy, has survived the great change in the conditions and circumstances under which they first arose where there was entire monopoly and extreme limitation of facilities. It has been adapted to the revolutionary changes in the mode of transportation with some deviations required by the peculiar facilities. It is a long way from the sailing vessel to the palatial liner, from the ancient caravan to the modern railroad train, from the ox cart to the automobile, from the stage coach to the airplane. But after all, each is merely a form of transportation, is subject to the same general law controlling public service, and must be held, in general, to the same principles and responsibilities. However, special and dis-

tinctive rules are imperative because of the physical differences in the carriages.

In general, while a common carrier is bound to receive all persons who desire to become passengers, this demand of the public interest is of necessity subject to some exceptions; thus, there may be justification for refusal of carriage for want of room in the vehicle. Furthermore, "A carrier of passengers not only has the power, but it is its duty, to adopt such rules and regulations as will enable it to perform its duties to the traveling public with the highest degree of efficiency, and to secure to its passengers all possible convenience, comfort, and safety." Brumfield v. Consolidated Coach Corporation, 240 Ky. 1, 40 S. W. (2d) 356, 361. Manifestly, those rules must be reasonable, according to the judgment of the courts, and they will be deemed reasonable if they redound to the comfort, convenience, safety, and health of the traveling public in general. Indeed, it is the duty of the carrier to adopt such rules and the duty of the passenger to obey them. A carrier's duty to other passengers cannot be lost sight of in observing the rights of an individual traveler. Chesapeake & Ohio Ry. Co. v. Spiller, 157 Ky. 222, 162 S. W. 815, 50 L. R. A. (N. S.) 394, Ann. Cas. 1915D, 186; Brumfield v. Consolidated Coach Corporation, supra; Hutchinson on Carriers, sec. 1077.

Among the recognized exceptions applicable to railroad and steamship carriers is that they may decline to receive for transportation one afflicted with contagious diseases whose presence would endanger the health of other passengers. Bogard's Adm'r v. Illinois Cent. R. Co., 144 Ky. 649, 139 S. W. 855, 36 L. R. A. (N. S.) 337; Hutchinson on Carriers, sec. 966. It is also the law that one who is so mentally or physically infirm as to be unable to take care of himself, or who may become a burden upon his fellow passengers or demand medical attention, may be refused passage. But the rule cannot be too rigorously enforced, and its application has been denied where the passenger has an attendant or has made provision for his own care. Hutchinson on Carriers, secs. 966, 992; Connolly v. Crescent City R. Co., 41 La. Ann. 57, 5 So. 259, 6 So. 526, 3 L. R. A. 133, 17 Am. St. Rep. 389.

Continuing our consideration of these general principles of the law of carriers to a closer relation to the

case in hand, regard must be had for the contract of carriage in process of execution.

Extreme infirmity from an infectious disease existed. It was held in Pullman Car Co. v. Krauss, 145 Ala. 395, 40 So. 398, 4 L. R. A. (N. S.) 103, 8 Ann. Cas. 218, that if after making a contract to carry a person with an infectious or contagious disease the carrier becomes aware of his condition it may put an end to the contract and decline to admit or carry him as a passenger. Should an infirm passenger be voluntarily accepted, his inability to care for himself being apparent or made known at the time of his acceptance, a greater duty ensues in caring for him, and the carrier will be held responsible if such care and assistance are not afforded. Hutchinson on Carriers, sec. 992. After having entered upon his journey, if the passenger becomes sick or in a helpless condition, it is the duty of the carrier to exercise the reasonable and necessary offices of humanity toward him until some suitable provision be made. This may require that he be removed and left at a suitable place until he becomes able to resume his journey or until he shall obtain proper aid and assistance. Michie on Carriers, secs. 2976, 3020; Hutchinson on Carriers, sec. 992. Or where a passenger's conduct or condition is such as to render his presence dangerous to fellow passengers and such as will occasion serious annoyance and discomfort, it is not only a right but a duty of the carrier to exclude him, having due regard always for the rights of such passenger. This duty to exercise reasonable care and diligence toward him does not end with removal, but it must continue in providing temporarily for his safety. Hutchinson on Carriers, sec. 992; Atchison, T. & S. F. Ry. Co. v. Parry, 67 Kan. 515, 73 P. 105; Atchison, T. & S. F. Ry. Co. v. Weber, 33 Kan. 543, 6 P. 877, 52 Am. Rep. 543; Railway Co. v. Valleley, 32 Ohio St. 345, 30 Am. Rep. 601. These rules, in their application to particular situations, may require that one who accompanies such disabled passenger, though he may not himself be objectionable or incapacitated, be ejected if it is necessary that he remain with the other. Braun v. Northern Pacific Ry. Co., 79 Minn. 404, 82 N. W. 675, 49 L. R. A. 319, 70 Am. St. Rep. 497.

The right or power of ejection of a passenger for these reasons is, obviously, hedged about with certain

limitations regardless of the justification for exercising it. Thus, in the absence of a statute, it must be done in a proper manner so as to avoid violating the duty of considerate treatment, which continues until there is an actual ejectment, and at a point where the passengers will not be subjected to peril. If it be wrongful in any particular, it follows that the carrier is liable for damages proximately resulting from the tort. Michie on Carriers, secs. 3016, 3408; Cincinnati, N. O. & T. P. Ry. Co. v. Carson, 145 Ky. 81, 140 S. W. 71; Louisville & N. R. Co. v. Tuggle's Adm'r, 151 Ky. 409, 152 S. W. 270. Where the ejectment is caused by the misfortune of the passenger and his condition of illness or helplessness, so much the more must these obligations to care for him in a high degree of prudence and care for his safety be observed. Michie, sec. 3020; Eidson v. Southern Ry. Co. (Miss.) 23 So. 369; Conolly v. Crescent City R. Co., 41 La. Ann. 57, 5 So. 259, 6 So. 3 L. R. A. 133, 17 Am. St. Rep. 389.

In order to avoid liability for ejectment at an intermediate station, there must first be a tender or return of fare less that from the point of origin. Michie, sec. 3022.

The foregoing historical narrative and reference to railroad and steamship companies and to the law of carriers generally, some of which may be regarded as of the nature of obiter dictum, has seemed helpful as an approach to the decision of the case at bar. In this changing world, we have come far from the modal conditions of transportation out of which came the genesis and development of our law of common carriers, although perhaps as measured by these latter day conceptions not so far from the original doctrine of regulation of public agencies. In adapting the general principles to the newest mode of transportation, it is not altogether "putting new wine in old bottles." Although the same principles must obtain and be applied the law of aeronautics cannot be completely synchronized with the law pertaining to other agencies, for it must be modified to meet the traffic problems of the novel method. The inherent nature of the facilities of an airplane cannot be disregarded. In respect of those things we have been considering, it demands an extension or broadening of the powers of the proprietors, or to be exact, a lessening of the powers of control or

interference with a private enterprise. Transportation has become highly competitive and other reasons for some of the older rules of compulsion, such as dependence by travelers, have lost their force. The nature of the method of transportation imposes different and distinct duties pertaining to the safety and comfort of those served.

The reasonableness of the rules of the air carrier must be measured accordingly. Although the safety of the passengers, individually and collectively, must ever be regarded as the prime criterion, provision for their convenience and comfort is more essential aboard an airplane in flight with its restrictions and limitations of space than on surface carriers where passengers may move about with some degree of freedom. The right to reject or eject passengers from an airplane must be sustained not only upon grounds deemed justifiable where older methods of carriage are used, but other reasonable grounds as well because of the necessarily close personal proximity of the passengers. We think the statement of the learned author of the article, "Airline Passenger Discrimination," appearing in the Journal of Air Law, vol. 3, p. 479 (acknowledgment being here made of its value in the preparation of the opinion) is sound law, pertinent to the case at bar, namely:

> "Diseased persons, who are likely to be repulsive to passengers, or persons who may communicate a disease should, of course, be refused. The carrier owes the duty to its passengers not only to protect them from dangers incident to transportation, but to avoid placing anything among them which might injure them. The quarters are so crowded aboard an airplane that the opportunities for contamination or repulsion are usually more imminent than on board surface carriers."

The nature of the business and the machine make it almost necessary that the courts sanction a reasonable discretion in these matters on the part of the operators, and that their judgment, if exercised in good faith and upon reasonable grounds, should be accepted prima facie as justification. This must be particularly so in relation to sick and invalid persons or others whose

presence may demand such extraordinary individual care as to interfere with the discharge of duties owing to other passengers.

And though such a person shall have been accepted for transportation in the reasonable belief that he is able to make the journey to his destination without inconvenience or danger, if enroute he becomes so sick that not only his own health and life are endangered, but the convenience, comfort, and health of other passengers are imperiled, it seems to us the carrier has the duty and the right to remove such passenger from the plane. Of course, due regard must be had for its concomitant and commensurate duty of humane and considerate treatment and the several obligations resting upon carriers generally in relation to the manner and place of ejectment and the refund of the proportionate fare.

In the case at bar, the carrier had accepted Casteel as a passenger when he was known to be afflicted with a highly infectious disease, although then assured that he was able to make the journey. After having proceeded some distance, he was found to be suffering from the effects of air travel, and a physician of high standing and qualification pronounced him unable because of the atmospheric conditions and changing altitudes to go farther by plane. The carrier was in a situation of necessity rather than of choice. Even though we give strict interpretation of the testimony of Mrs. Casteel that it was against their will, the carrier showed the unfortunate passengers every consideration and gave them the best of care and attention. It is our conclusion that the ejectment was justified under the law, and that no tort was committed.

As to the individual case of Mrs. Casteel, it is apparent that she acted voluntarily, and quite naturally. in choosing to remain with her sick husband. But if it be regarded otherwise, she proved no recoverable damage by reason of her ejectment.

The court properly directed verdicts for the defendant.

Judgments affirmed.

Whole court sitting.