PRICE, Judge.
This is an appeal from a judgment awarding plaintiff damages for the refusal of a common carrier to sell him a ticket for passage from Shreveport to New Orleans.
Dr. Walter Dean Austin, Dean of Southern University in Shreveport, made a reservation in advance for passage on the Delta Air Lines flight leaving Shreveport at 11:00 a. m. on February 8, 1969, for New Orleans. Dr. Austin was accompanied to the airport by Reverend John Maple and Leonard Washington. He presented himself at the Delta ticket window after waiting his turn in line, identified himself and requested his ticket in accordance with his previously confirmed reservation.
Although the testimony is contradictory as to the exact words spoken to Dr. Austin, he was informed that he would not be issued a ticket for this flight as he did not appear to be in proper condition to travel. After a discussion with the ticket agent, or the supervisor, plaintiff proceeded to the Braniff ticket window, where he secured passage on a flight leaving approximately one hour later.
Suit was filed by Dr. Austin against Delta Air Lines, Inc. and J. R. Goff, the ticket agent employed by Delta, identified by plaintiff as the person who refused him passage. Plaintiff alleges the agent of Delta made defamatory statements to him in the presence of others with the intent to ridicule and embarrass him. He seeks damages for embarrassment, humiliation and injury to his professional reputation because of the allegedly unjustified refusal of the common carrier to sell him a ticket for passage on this flight and the causing of humiliation and embarrassment for being unjustly accused of drunkenness. Damages are itemized as $10,000 for embarrassment and $20,000 for injury to plaintiff’s professional reputation.
Defendants answered plaintiff’s petition, admitting he had a reservation for passage on this flight and was refused passage. In justification of their refusal to honor the reservation, defendants allege that in the judgment of the personnel of defendant on duty at this time, plaintiff appeared to be in such a condition as would probably cause him to be unable to care for himself in the event of an emergency. Defendants contend that in refusing passage to plaintiff in this instance they were following the mandate of the Civil Aero *896 nautics Board rules as prescribed in Local and Joint Passenger Rules Tariff No. PR-5 and published in C.A.B. #117, as follows:
“REFUSAL TO TRANSPORT
(A) Carrier will refuse to transport or will remove at any point, any passenger—
******
(2) Passenger's Conduct or Condition— whose conduct, status, age or mental or physical condition is such as to—
(a) render him incapable of caring for himself without assistance, unless—
(i) he is accompanied by an attendant who will be responsible for caring for him enroute, and
(ii) with the care of such attendant, he will not require unreasonable attention or assistance from employees of the carrier; * * * ”
After a trial on the merits, the district court awarded plaintiff judgment for $500. Defendant appealed suspensively from this judgment and plaintiff answered the appeal, asking for an increase in the amount awarded by the trial court.
The trial judge in his reasons for judgment recognizes the necessity for allowing much discretion in airlines to refuse passage to persons whom they reasonably believe would not be in a condition to travel. However, he found the action of Delta’s agents in this case to be wrongful in that the evidence did not disclose plaintiff was drunk at the time, and he was accepted for passage immediately thereafter by a competing airline.
On this appeal counsel for Delta argues it is immaterial whether the person refused passage was in truth and fact intoxicated at the time, but if his actions and mannerisms are such that it could reasonably be believed that he was not in a physical condition to care for himself in the event of an emergency, then neither the airline nor its agents may be held liable for refusing passage.
The obligation imposed on a common carrier to accept a passenger who tenders the proper fare for passage is discussed by the Supreme Court of Massachusetts in an early case, Holton v. Boston Elevated Ry. Co., 303 Mass. 242, 21 N.E.2d 251 (1939):
“The defendant was a common carrier and everyone who presented himself in proper condition was entitled to use the defendant’s facilities upon the payment of the usual charge. ‘The general rule that a common carrier is bound to accept anybody and everybody who presents himself for transportation and pays the regular fare, has its limitations. A common carrier is bound to care for all who have become its passengers. For that reason not only is it not bound to accept, but it is under obligation to refuse to accept as a passenger * * * one who because of intoxication or for any other reason would be offensive to other passengers. Vinton v. Middlesex Railroad Co., 11 Allen 304, 87 Am.Dec. 714; Murphy v. Union Railway Co., 118 Mass. 228; Hudson v. Lynn & Boston Railroad Co., 178 Mass. 64, 59 N.E. 647.’ Connors v. Cunard Steamship Co., 204 Mass. 310, 315, 90 N.E. 601, 603, 26 L.R.A.,N.S., 171, 134 Am.St.Rep. 662, 17 Ann.Cas. 1051.”
The Court of Appeals of the State of Kentucky in a 1935 decision in the case of Casteel v. American Airways, 261 Ky. 818, 88 S.W.2d 976 (Ky.Ct.App.1935), after discussing the history and origin of the principles of law requiring common carriers, such as steamships and railroads to accept all passengers and their liability for refusal to do so, pointed out the necessity for a modification of these principles in connection with air passengers:
“The foregoing historical narrative and reference to railroad and steamship companies and to the law of carriers generally, some of which may be regard *897 ed as of the nature of obiter dictum, has seemed helpful as an approach to the decision of the case at bar. In this changing world, we have come far from the modal conditions of transportation out of which came the genesis and development of our law of common carriers, although perhaps as measured by these latter day conceptions not so far from the original doctrine of regulation of public agencies. In adapting the general principles to the newest mode of transportation, it is not altogether ‘putting new wine in old bottles.’ Although the same principles must obtain and be applied, the law of aeronautics cannot be completely synchronized with the law pertaining to other agencies, for it must be modified to meet the traffic problems of the novel method. The inherent nature of the facilities of an airplane cannot be disregarded. In respect of those things we have been considering it demands an extension or broadening of the powers of the proprietors or to be exact, a lessening of the powers of control or interference with a private enterprise. Transportation has become highly competitive and other reasons for some of the older rules of compulsion, such as dependence by travelers, have lost their force. The nature of the method of transportation imposes different and distinct duties pertaining to the safety and comfort of those served.
“The reasonableness of the rules of the air carrier must be measured accordingly. Although the safety of the passengers, individually and collectively, must ever be regarded as the prime criterion, provision for their convenience and comfort is more essential aboard an airplane in flight with its restrictions and limitations of space than on surface carriers where passengers may move about with some degree of freedom. The right to reject or eject passengers from an airplane must be sustained not only upon grounds deemed justifiable where older methods of carriage are used, but other reasonable grounds as well because of the necessarily close personal proximity of the passengers.”
j|< 5ji jji # Jji ‡
“The nature of the business and the machine make it almost necessary that the courts sanction a reasonable discretion in these matters on the part of the operators, and that their judgment, if exercised in good faith and upon reasonable grounds, should be accepted prima facie as justification. This must be particularly so in relation to sick and invalid persons or others whose presence may demand such extraordinary individual care as to interfere with the discharge of duties owing to other passengers.”
Although the pronouncements of the court were made over 35 years ago, while aviation was still in its infancy, the logic and wisdom of this decision is more readily apparent at the present time.
For the reasonable safety and comfort of the passenger requesting to be transported, and all other persons to be carried on the same flight, the personnel of the airline who are responsible for issuing tickets for passage must be given much discretion in determining a person’s physical suitability for making the intended flight. Obviously, their conclusion will not always be correct when viewed in retrospect. If, however, their determination is made in good faith based on observation of personal appearance, actions or conduct which would reasonably lead the airline employees to believe the person presenting himself for passage was not in proper physical or mental condition to adequately care for himself in an emergency, or who might cause annoyance to other passengers because of his condition, then no liability should attach even if the conclusion later proved to be erroneous.
In the case under consideration, the ticket agent, Goff, testified he observed plaintiff and his two companions while he was preparing and issuing tickets to two other persons in line ahead of plaintiff. *898 He testified his attention was directed to these parties by rather loud and boisterous conversation between them. He further testified the plantiff was leaning on the two parties with him, apparently for support. Goff testified that at the time plaintiff introduced himself and requested his ticket, he placed his elbow on the counter for support and allowed it to slip, barely avoiding a fall. He testified he stepped to the next room and asked his supervisor, Douglas Free, to observe plaintiff and instruct him on whether to issue the ticket. A question was asked of plaintiff regarding his luggage to enable Free to hear him speak. Plaintiff was then informed the airline could not issue him a ticket on this flight.
The gist of the testimony of both Goff and Free was to the effect that because of the actions and speech of plaintiff, they believed him to be under the influence of alcoholic beverages or drugs to such extent that he should not be allowed to travel at that time. The record does not indicate that either of these parties made any discourteous or insulting remarks to plaintiff. Neither Goff nor Free was acquainted with Dr. Austin prior to this time.
The evidence shows that during the last week in January of 1969, Dr. Austin was hospitalizd for a severe nosebleed resulting from a hemorrhage. He had been restricted to his home up until the date of this incident and this was his first venture out of his house following his illness. He was still taking medicine or drugs prescribed by his physician in treatment of his condition. He was described by one of his companions, Reverend John Maple, as still being in a weakened condition. Maple’s testimony depicting plaintiff’s appearance preceding this incident is as follows:
“Q. All right, now, on direct examination counsel asked you about Doctor Austin’s manner of walking that morning, and your reply was ‘he did not really stagger’. You mean by that he didn’t fall down, or fall forward, or anything of that kind, but he walked a little shaky; is that right?
“A. Well, he walks kind of that way anyway, sir, when he walks, you know, he kind of moves from side to side.
“Q. Kind of walks a little shaky all of the time, is that right?
“A. Yes, sir, he walks from side to side.
“Q. And you said that that morning he was very obviously quite weak because he had been in the hospital and had been taking'medicine, is that right?
“A. Not as weak as he was when he first came out of the hospital, but he was—
“Q. He was still weak?
“A. Yes, sir, as far as I—
“Q. And his manner of talking, was it a little slurred?
“A. Well, not really slurred, but he kind of talks slow, too, you know. Yes, sir.”
Neither Maple nor plaintiff’s other companion, Leonard Washington, gave any testimony accusing Goff or Free of using abusive language toward plaintiff. The conversation began in a normal tone of voice, they testified, and only after plaintiff questioned their right to deny him passage did the conversation become louder.
From the evidence it is apparent that the mannerisms of Dr. Austin which lead Delta’s employee to suspect that he was under the influence of alcoholic beverages actually resulted from a physical weakness following his period of convalesence from the hemorrage and possibly from medicine being taken in treatment thereof. There is no testimony showing that Dr. Austin informed either Goff or Free of his physical health at that time.
Although this was an unfortunate happening which did inconvenience the *899 plaintiff and cause him some degree of embarrassment, under the circumstances as depicted by the evidence, we do not find the agents of Delta have exceeded the necessary discretion vested in them in refusing passage to someone they had reason to believe might not be able to care for himself in the event of an emergency. The evidence showed the flight in question had space for 22 additional passengers at the time of this incident; therefore it would have been to the financial advantage of the airline to have issued the ticket.
For the foregoing reasons, the judgment appealed from is reversed and it is ordered, adjudged and decreed that there be judgment in favor of defendants, rejecting the demands of plaintiff at his costs.